**In re PCH ASSOCIATES, Debtor.**

**Bankruptcy No. 84–B–11540.**

United States Bankruptcy Court, S.D. New York.

Dec. 18, 1990.

Jones, Day, Reavis & Pogue by Marc S. Kirschner, Cindy E. Tzerman, New York City, for debtor.

Saul, Ewing, Remick & Saul by Robert S. Blau, Philadelphia, Pa., and by J. Dennis Faucher, New York City, for Simon–Tye Associates and 135 Ventures, Inc.

Bodian & Eames by David T. Eames, New York City, for Liona Corp., Inc.

## DECISION ON MOTION TO OBTAIN ESCROWED FUNDS PROCEEDS, COMPENSATION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF COSTS

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

This case involves a dispute with Simon–Tye Associates and 135 Ventures, Inc., (the "Third Mortgagee") over a portion of the proceeds of the sale of the Philadelphia Centre Hotel (the "Hotel"), plus interest. At the closing of the sale of the Hotel, the Third Mortgagee was paid the full principal of its debt, plus an estimated sum based on the pre-default contract interest rate of 8%. A sum of $1,147,261 ("Escrowed Funds"), representing the difference between the estimated amounts of pre-default interest and the default rate of 12%, as well as amounts claimed by the Third Mortgagee under § 506(b) of the Bankruptcy Code (the "Code") for legal fees, was placed in escrow.

A trial was held on March 24 and 25, 1988 to determine the Third Mortgagee's entitlement to the Escrowed Funds. Two significant rulings were made at the conclusion of the trial:

*First,* this Court denied the Third Mortgagee's motion to amend its Complaint to assert that the 12% post-default rate was triggered automatically at a time prior to the filing of the petition bankruptcy. At all times prior to the trial in this case, the Third Mortgagee adopted the theory that the default rate was triggered after an acceleration of the Note which it claims took place as of November 3, 1984, after the filing of the chapter 11 Petition. The Third Mortgagee's election to accelerate the entire principal balance due on the First and Second parts under the Note was based on PCH Associates's ("PCH") failure to make the October 1, 1984 payment and on the voluntary chapter 11 filing [Pretrial Order, ¶ 96 at 26].

Practically on the eve of trial, the Third Mortgagee abandoned this theory, instead claiming that the post-default interest rate was triggered as of October 25, 1984, 10 days after the date of the Notice of Default [Pre–Trial Order, ¶ 92 at 24]. At the trial, the Third Mortgagee voiced its desire to amend its Complaint to introduce the new theory [Record at 194], but its request was denied [Record at 299]. The Third Mortgagee was given leave to revisit the ruling as to the applicability of default interest in its post-trial brief.

*Second,* the 19% bonus for legal fees was denied [Record at 302–303].

This Court then directed the filing of Post–Trial Briefs with respect to the reserved issues regarding certain reductions (or credits) claimed by PCH to the interest computed at the non-default rate of 8% and the reasonableness of incurred time charges and disbursements claimed by the lawyers for the Third Mortgagee.

The following are the findings of fact based on the uncontested facts in the Joint Pre–Trial Order and the documentary and oral evidence adduced at trial:

A. *Background*

1. Simon–Tye Associates is a Pennsylvania general partnership, and 135 Ventures, Inc. is a Pennsylvania business corporation. Prior to September 24, 1981, they were partners in Simon Associates, a partnership that owned the real estate at 1725 J.F. Kennedy Boulevard, Philadelphia, PA, which is the land and building known as the Philadelphia Centre Hotel [Pre–Trial Order, ¶ 43 at 11].

2. The Third Mortgagee sold its partnership interest in Simon Associates pursuant to an Agreement of Sale, dated December 18, 1980, and amended March 25, 1981 (the "Agreement") [Pre–Trial Order, ¶ 44 at 12].

3. As part of the purchase price, on September 24, 1981, Bernturn Corp., as agent for the purchasers, executed and delivered to the Third Mortgagee a Note in the principal amount of $5,169,365 (the "Note") [Pre–Trial Order, ¶ 45 at 12; Joint Exhibit Binder, Exhibit "A"].

4. To secure the obligations due under the Note, the Third Mortgagee took a third mortgage and security interest on the Hotel real estate and personal property (the "Third Mortgage") [Pre–Trial Order, ¶ 46 at 12; Joint Exhibit Binder, Exhibit "B"].

5. The Third Mortgage was subordinate to two mortgages covering the same property; a first mortgage held by First Pennsylvania Bank N.A. ("First Mortgage") and a second mortgage held by Barclays American Business Credit, Inc. (the "Second Mortgage") [Pre–Trial Order, ¶ 47 at 12].

6. Soon after the partnership was sold by the Third Mortgagee, the name of the partnership was changed from Simon Asso-

ciates to PCH. Bernturn Corp., a Delaware corporation is the general partner of PCH [Pre–Trial Order, ¶ 49 at 13].

7. At the time PCH bought the real estate and hotel business in September 1981, in addition to giving the First, Second and Third Mortgages, PCH entered into a transaction with Liona Corporation, Inc. ("Liona") that has been the subject of dispute and litigation between PCH and Liona regarding the characterizations of their respective interests in the Hotel land and building. The First Mortgage, Second Mortgage and Third Mortgage, each, covered the hotel land and building and were each senior and superior to the interests claimed by PCH and Liona in the Hotel [Pre–Trial Order, ¶ 48 at 12–13].[1]

8. On April 1, 1984, PCH failed to pay an installment of principal and interest under the Note [Record at 69, 228–230].

9. Sometime later, PCH paid the principal installment and interest at the pre-default contract rate of 8%, plus an additional $2,000 which PCH agreed to pay pursuant to the Third Mortgagee's request for "certain additional sums for" the late payment. It does not appear that the 12% default rate had been automatically triggered [Record at 69, 228–230, 232].[2]

10. On October 1, 1984, PCH failed to pay another installment of principal and interest under the Note [Pre–Trial Order, ¶ 50 at 13; Record at 230].

11. During the period October 1, 1984 through November 2, 1984, PCH and the Third Mortgagee had a number of discussions regarding the missed October 1, 1984 installment. During the course of those discussions, although threatening to take affirmative action against PCH, the Third Mortgagee never demanded from PCH additional interest over and above the pre-default contract rate of 8%; nor did the Third Mortgagee take any other action against PCH or accelerate or purport to accelerate

1. On May 5, 1988, this Court dismissed Liona's Complaint seeking to declare that it had an interest in the Hotel, including the land and building, superior to PCH and granting PCH's cross-motion for summary judgment directing immediate distribution of the net proceeds of the sale of the Hotel to the administration and

unsecured creditors of PCH. Liona has filed a notice of appeal from the order entered pursuant to this decision.

2. The Third Mortgagee characterizes the $2,000 payment as a "default payment" [Third Mortgagee's Proposed Finding of Facts, ¶ 9 at 5–6].

the debt under the Note and Third Mortgage and declare it immediately due and payable [Record at 71–72, 230–232].

12. By letter, dated October 15, 1984 (the "Notice of Default"), the Third Mortgagee warned PCH that the October 1, 1984 installment was missed and stated that if the installment payment was not made within ten (10) days, the Third Mortgagee would be entitled "to exercise the remedies provided in the Note and Third Mortgage, including acceleration of the entire indebtedness" [Joint Exhibit Binder, Exhibit "C"].

13. The Third Mortgagee concedes that prior to November 2, 1984, an acceleration of the debt under the Note and Third Mortgage did not occur [Third Mortgagee's Memorandum, at 30–32; Record at 71–72, 293 and 299].

14. On November 2, 1984 (the "Filing Date"), PCH filed a petition for reorganization under chapter 11 of the Code. PCH continued to operate the Hotel as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Code until November 30, 1986, on which date the Hotel closed [Pre–Trial Order, ¶ 54 at 14].

15. On January 11, 1985, the Third Mortgagee sent a letter to PCH advising that the October 1, 1984 installment under the Note, as well as the installment due on January 1, 1985, had not yet been received. In the letter, no demand for post-default interest was made; the Third Mortgagee did not accelerate or purport to accelerate the indebtedness due under the Note; and no indication was given that a prior acceleration had occurred [Joint Exhibit Binder, Exhibit "D"].

16. In early February 1985, PCH filed its chapter 11 Schedules with the Bankruptcy Court. Schedule A–2 sets forth as undisputed an aggregate amount due to the Third Mortgagee of $5,107,237.40, as of the Filing Date. There were two components to that amount. The first component, $80,875.00, represented accrued interest for the period October 1, 1984 through the Filing Date calculated at the pre-default contract rate of 8% less the "reduction amounts" under the Note. The second component, $5,026,362.40, represented the principal

amount of the indebtedness then outstanding [Record at 233–236; PCH Exhibit Binder, Exhibit "1"].

17. By Order, dated May 28, 1985 (the "Claims Bar Order"), this Court fixed June 27, 1985 (the "Bar Date") as the last date for filing of all proofs of claim. [PCH Exhibit Binder, Exhibit "17"].

18. The Third Mortgagee has not filed a proof of claim in these proceedings [Pre-Trial Order, ¶ 80 at 22].

B. *Applicable Provisions of the Note*

19. Under the terms of the Note, the principal indebtedness was divided into a "First Part" and a "Second Part".

20. After applying the July 1, 1984 payment (the last regularly scheduled installment payment that was made), the balance of the First Part of principal was $4,557,665.00 and the balance of the Second Part of principal was $468,698.00 [Pre–Trial Order, ¶ 74 at 20; Record at 269–270].

21. Absent acceleration based on default, the principal amount of the Second Part would not have been payable until October 1, 1987, the date specified for payment of the final installment of the First Part of principal. [Note at 4; Record at 293].

22. Absent acceleration, the maturity date under the Note of both the First Part and Second Part was October 1, 1987 [Note at 3–4].

23. The Note states that "[t]he Second Part shall be due in its entirety on the Maturity Date on such earlier date as required by acceleration because of the occurrence of an Event of Default.... No interest other than the interest at the rate of eight percent (8%) per annum on the First Part as reduced as provided above shall accrue or be paid on the Second Part prior to its maturity (*i.e.*, October 1, 1987) [Joint Exhibit Binder, Exhibit "A", Note at 3–4].

24. The Note further provides, in part, as follows:

"Any one of the following shall constitute an Event of Default hereunder, upon the occurrence of which the entire unpaid balance of principal, at the option

of the holder of this Note, shall become immediately due and payable:

> (a) the failure of Maker to make any payment of principal or interest within then (10) days of notice thereof...."

[Note at 6].

25. The Note further provides, in part, that:

> "Following the occurrence of an Event of Default, interest shall accrue on the principal amount hereof at the rate of twelve (12%) percent per annum and shall be payable upon demand."

[Note at 7].

26. The Note provided for pre-default interest accrued on the First Part calculated at the rate of eight (8%) percent per annum "less the reduction amounts" set forth in the Note. These "reduction amounts" were to be taken a follows:

> "The amount of interest otherwise payable on the first day of each calendar quarter on the First Part and the Second Part shall be reduced by an amount equal to the sum of:
>
> (a) one-twelfth of two percent of the declining principal balance of the First Mortgage for each of the three (3) months in the calendar quarter in question; and
>
> (b) $4,318.47 ($25,189.49 less $23,750 times three representing the increase in debt service payments owing on the Second Mortgage for each quarter following delivery of the Amendment and Consent of this date) for so long as the Second Mortgage remains unpaid."

[Pre–Trial Order, ¶ 75 at 20; Joint Exhibit Binder, Exhibit "A", Note at 3].

27. The reductions or credits to the 8% pre-default interest were agreed to because the First and Second Mortgagees required increases in the interest rates on their respective mortgages, as a result of which the Third Mortgagee agreed to a corresponding reduction of interest on the Third Mortgage. To reimburse the Third Mortgagee for permitting this reduction, the reductions to the interest were added to the principal of the Third Mortgage and became the Second Part of principal.

28. The amount of interest reflected in PCH's chapter 11 Schedules as due and owing the Third Mortgagee includes a full credit for the "reduction amounts" [*supra*, ¶ 16; Record at 234–236].

29. The Note also provides for a discount in principal in accordance with an agreed upon schedule in the event of prepayment prior to October 1, 1987. The discount schedule is attached to the Note. Based on the prepayment of principal on May 13, 1987, PCH is entitled to a prepayment discount of $33,206.00. The Third Mortgagee now concedes this point [Third Mortgagee's Memorandum at 17; Joint Exhibit Binder, Exhibit "A", Note at 4, 10–11].

C. *The Drop Dead Stipulation*

30. On December 11, 1985, the Third Mortgagee filed a motion for relief from the automatic stay to permit it to foreclose on the Third Mortgage. At a hearing held on January 8, 1986, without any trial on the merits and without any determination of amounts due to the Third Mortgagee, counsel for the Third Mortgagee and counsel for PCH and its Creditors' Committee entered into a stipulation (the "Drop Dead Stipulation") on the record which was "so ordered" by the Bankruptcy Court. Counsel for the Third Mortgagee, Mr. Dennis Faucher, reported the stipulation to the Court, which provided in relevant part as follows:

> ... on September 1, 1986, without the need of further Order of this Court, the third mortgagee shall have relief from and shall no longer be bound by the provisions of the automatic stay, and on that date the third mortgagee shall have the right to exercise all rights to execute on the collateral to the same extent as if these bankruptcy proceeds [sic] were not pending....

Liona was not a party to the Drop Dead Stipulation. [Pre–Trial Order, ¶ 56 at 14–15; Record at 213; Joint Exhibit Binder, Exhibit "E", Drop Dead Stipulation at 5.]

D. *PCH Motions to Enjoin the Third Mortgage from Taking the Steps Outlined in the June 18, 1986 Letter*

31. On June 18, 1986, the Third Mortgagee gave written notice to PCH that on

September 1, 1986 it would, *inter alia,* confess judgment and schedule a Sheriff's sale. [Pre–Trial Order, ¶ 57 at 15; Joint Exhibit Binder, Exhibit "F".]

32. PCH believed the threats in the June 18, 1986 letter would destroy its ability to sell the Hotel because "people [PCH] had been working with trying to sell the property to would sense an ability to buy cheaply at a foreclosure sale and it would injure [PCH's] ability to sell arm's length." [Record at 258]

33. As a result, on June 26, 1986, PCH moved to enjoin the Third Mortgagee from taking the steps outlined in the June 18, 1986 letter [Record at 258; PCH Exhibit Binder, Exhibit "3"].

34. At a hearing held on July 8, 1986 in connection with the motion to enjoin the actions threatened in the June 18, 1986 letter, the Third Mortgagee agreed not to take any of the actions listed in the June 18, 1986 letter [PCH Exhibit Binder, Exhibit "3", Transcript of July 8, 1986 Hearing at 24–25].

### E. *The Confession of Judgment*

35. On September 2, 1986, the Third Mortgagee caused a Confession of Judgment to be filed in the Court of Common Pleas of Philadelphia County, Pennsylvania, as of September Term, 1986, No. 169 (the "Confession of Judgment") [Joint Exhibit Binder, Exhibit "G"].

36. Judgment was entered in favor of the Third Mortgagee against PCH in the amount of $6,399,144, computed as follows:

| | |
|---|---|
| Outstanding Principal Balance | $ 5,026,362.40 |
| Interest due under the terms of the Note to November 2, 1984 | 80,875.00 |
| Interest at default rate of 12% from November 3, 1984 to September 2, 1986 | 1,105,523.40 |
| Plaintiffs' counsel fees for confessing judgment in the amount of 3% of principal and interest due, as provided for in the Note and Third Mortgage | 186,382.82 |
| TOTAL: | $ 6,399,143.62 |

In addition to the unpaid principal, the Confession of Judgment included attorneys' fees of $186,382.82 and accrued interest of $1,186,398.40 [Pre–Trial Order, ¶ 59 at 15–16].

37. The amount of $80,875.00 reflected in the Confession of Judgment for accrued pre-petition interest is identical to the amount scheduled by PCH in Schedules A–Z of its chapter 11 Schedules. Thus, in calculating the amount of interest which accrued prior to the filing date (*i.e.*, between October 1, 1984 and November 2, 1984), the Third Mortgagee, itself, applied the pre-default contract rate of 8% and gave PCH full credit for the "reduction amounts". [Pre–Trial Order, ¶ 59 at 15; Record at 234–236.]

38. On September 5, 1986, the Third Mortgagee gave written notice to PCH and Liona of the entry of the judgment by confessions. [Joint Exhibit Binder as Exhibit "H"; Pre–Trial Order, ¶ 60 at 16.]

39. To enforce the Confession of Judgment, a Writ of Execution was issued by the Prothonotary of Philadelphia directed to the Sheriff to levy upon and sell the interest of PCH in the Hotel. [Joint Exhibit Binder as Exhibit "I"; Pre–Trial Order, ¶¶ 61 and 16–17.]

40. PCH has not filed a petition in the Pennsylvania State Court to open or strike the Confession. [Pre–Trial Order, ¶ 73 at 20.]

### F. *The Scheduled Sheriff's Sale*

41. A Sheriff's sale of the real estate was scheduled for December 1, 1986. [Pre–Trial Order, ¶ 62 at 17.]

42. Between September 11, 1986 and November 25, 1986, PCH attempted, in its chapter 11 proceedings, to have this Court stop the Sheriff's sale. The attempts and the results were as follows:

A. On September 12, 1986, PCH commenced an adversary proceeding for

an injunction against the Philadelphia County Sheriff and the Third Mortgagee. Adversary Proceeding No. 86–5615. At the hearing, PCH withdrew its complaint and the court vacated its temporary restraining order.

B. On October 24, 1986, PCH filed a second adversary proceeding or an injunction in this Court. No. 86–5727A. A hearing was held on October 30 and 31, 1986, on PCH's Order to Show Cause. After the hearing, Bankruptcy Judge Blackshear dismissed PCH's request for a preliminary injunction. The Court refused to vacate the January 8, 1986, Stipulation and Order and refused to enjoin the Sheriff's Sale. A copy of the transcript of the two days of hearings and of the Court's Bench Opinion constituting Findings of Fact and Conclusions of Law has been admitted into evidence and is included in the Joint Exhibit Binder as Exhibit "J."

C. On November 20, 1986, PCH filed a motion to reargue the Order entered by this Court on October 31, 1986. After a hearing on November 25, 1986, this Court denied PCH's motion for reargument. [Pre–Trial Order, ¶ 63 at 17.]

43. On or about November 28, 1986, an involuntary chapter 11 petition was filed against Liona in the United States Bankruptcy Court for the Eastern District of Pennsylvania, Case No. 86–05484–BIF, following which an order for relief was entered against Liona. [Pre–Trial Order, ¶ 64 at 18.]

44. The December 1, 1986 Sheriff's sale was postponed by virtue of the automatic stay applicable to the Liona bankruptcy. The Sheriff's sale was rescheduled for January 5, 1987, at 2:00 P.M., pursuant to Pennsylvania and Philadelphia rules [Pre–Trial Order, ¶ 65 at 18].

45. The Third Mortgagee sought relief from the automatic stay applicable to Liona in the United States Bankruptcy Court for the Eastern District of Pennsylvania. Hearings were held before Judge Bruce Fox on December 31, 1986 and January 2,

1987. On the morning of January 5, 1987, Judge Fox ruled in favor of the Third Mortgagee, granting relief from the automatic stay and determining that the real estate could be exposed for sale later that day [Pre–Trial Order, ¶ 66 at 18].

G. *The Bankruptcy Auction Sale; Distribution of Proceeds*

46. At a hearing before this Court on January 5, 1987, after extensive negotiations with all parties, an agreement was reached that prevented the Hotel from being sold at a Sheriff's sale at a distress price, which would have yielded no proceeds for administration or unsecured creditors of PCH, no proceeds for Liona and no proceeds for the Third Mortgagee. Instead, with the approval of this Court, PCH, Liona, the Third Mortgagee and PCH's Creditors' Committee agreed, *inter alia,* that the Hotel would be sold at a widely-publicized bankruptcy auction sale on February 11, 1987. PCH and Liona also agreed to reserve their dispute for resolution at a subsequent time in order to cooperate in the auction sale, without waiver or prejudice to any of their rights. As a concession to induce the Third Mortgagee to enter into the compromise, PCH agreed not to contest principal and the non-default interest of 8% per annum, payable to the Third Mortgagee under the Note and Third Mortgagee, but PCH and Liona reserved all rights to contest default and penalty interest, as well as attorneys' fees and other costs under the Note and Third Mortgagee. Special arrangements were made to give the Third Mortgagee time to arrange to carry and pay for the costs of preserving and maintaining the property if it were required to bid-in at the auction sale. [Joint Exhibit Binder, Exhibit "K"; Transcript of January 5, 1987 Hearing.]

47. On February 11, 1987, a public auction was held to sell the Hotel land and personal property [Pre–Trial Order, ¶ 68 at 19].

48. Liona, as permitted by order of the Bankruptcy Court for the Eastern District of Pennsylvania, entered February 10, 1987, consented to the auction of the per-

sonal property and the land (the "Liona Order"). [Pre–Trial Order, ¶ 69 at 19; Joint Exhibit Binder, Exhibit "L".]

49. By Order, dated February 12, 1987, this Court approved the sale of the Hotel land and personal property to Samuel Rappaport (the "Sale Order") for an aggregate gross price of $20,710,000.00. The Sale Order provided that the closing was to be held on May 13, 1987 and that the Third Mortgagee would be paid at the closing all principal and accrued interest at the pre-default contract rate of 8% per annum, under the Note and Third Mortgage, through the date the Confession of Judgment was entered and at the statutory rate of 6% per annum for judgments thereafter. The Order further provided that all other sums claimed by the Third Mortgagee under the terms of the Third Mortgage would be placed in a separate interest bearing escrow account subject to later determination. PCH reserved all its rights to contest default and penalty interest and attorneys' fees and other costs under the Note and Third Mortgage. No agreement was reached as to the proper method of calculating the 8% non-default interest under the Note; nor was the aggregate amount of such interest fixed by court order. [Pre–Trial Order, ¶ 70 at 19; Joint Exhibit Binder, Exhibit "M", Sale Order.]

50. Liona was present and represented by its counsel at the February 12, 1987 hearing during which this Court approved the Sale Order. Liona agreed to the entry of the Sale Order, and it is bound by the Sale Order [Pre–Trial Order, ¶ 71 at 19].

51. The sale of the Hotel land and personal property took place under PCH's Second Amended Plan of Reorganization (the "Plan") which was confirmed by this Court. The Third Mortgagee did not file an acceptance to the Plan. The Plan provided that the Third Mortgagee would be paid the full amount of its "Allowed Claim" in cash on the date of the closing of the sale of the Hotel [PCH Exhibit Binder, Exhibit "4", Plan at 10].

52. The sale of the Hotel land and personal property to Mr. Rappaport was closed on May 13, 1987. Between the filing date and the date of closing, PCH had not paid any real estate taxes and any interest or principal on the three mortgages. At the closing, in addition to the real estate taxes, all principal and non-default interest on the First Mortgage and Second Mortgage, collectively aggregating almost $10 million, was paid in full.[3] Disputed amounts aggregating $493,000.00 claimed by the First and Second Mortgagees were placed in escrow. Thereafter, settlements were reached with the First and Second Mortgagees regarding the disputed amounts. [Pre–Trial Order, ¶ 55 at 14; Record at 254; PCH Exhibit Binder, Exhibits "5", "6", "7", "8" and "18".]

53. Under the settlement agreements, the claims of the First and Second Mortgagees to the $493,000.00 held in escrow were settled for $84,000.00 in the aggregate. That amount approximated the collective attorneys' fees claimed by the First and Second Mortgagees. No default or penalty interest was paid to either the First or Second Mortgagee [Record at 255–259].

54. At closing, pursuant to the Sale Order and the Escrow Agreement amongst PCH, Liona, the Third Mortgagee and Gelberg and Abrams (the "Escrow Agreement"), the Third Mortgagee was paid the full principal and estimated interest due at the non-default contract rate of 8% through the date the Confession of Judgment was entered and at the 6% judgment rate thereafter, aggregating $5,770,922, and the Escrowed Funds of $1,147,261 were placed in an interest bearing escrow account subject to later determination [Pre–Trial Order, ¶ 72 at 20; Joint Exhibit Binder, Exhibit "N", Escrow Agreement].

## H. *The Third Mortgagee's Claim to Attorneys' Fees*

55. PCH had a plan formulated at the inception of the chapter 11 case to sell the Hotel. As of the Filing Date, PCH be-

---

**3.** Although, at the closing, PCH paid the First and Second Mortgage, up until that point, no payments had been made by PCH.

lieved that the value of the Hotel land and personal property was in the "mid $20 millions" [Record at 245-246, 248].

56. After the Filing Date, the Debtor entered into an agreement to sell the Hotel land and personal property to Michael Grasso for a purchase price of $25 million (including $5 million to be paid to Liona) plus a 25% equity participation in the acquiring partnership. While the agreement was approved by this Court, the transaction did not close [Record at 246–248].

57. Thereafter, PCH re-marketed the property. From the date the Grasso transaction failed to May 13, 1987 (i.e., the date of closing), PCH believed the Hotel land and personal property had a value of not less than $22 million [Record at 249].

58. In preparation for the hearing on the Third Mortgagee's motion for relief from the automatic stay, the Third Mortgagee commissioned an MAI Appraisal (the "Appraisal") of the Hotel land only. The Appraisal reflected a value of $18,150,000.00 as of December 26, 1985 [PCH Exhibit Binder, Exhibit "Z", Appraisal].

59. As of the Filing Date, the aggregate amount of the secured debt on the Hotel land and personality (including real estate taxes, and principal and interest on the First and Second Mortgagees) was approximately $13,161,000.00 [Record at 249].

60. As of December 31, 1985, the total of such secured debt was approximately $15,513,000.00 [Record at 250].

61. As of May 13, 1987, the total value of all such secured debt was (i) $19,171,000.00, including disputed amounts escrowed for the First and Second Mortgagees, or (ii) $18,761,000.00, excluding the disputed amounts to the First and Second Mortgagees and including only the amounts for which the First and Second Mortgagees ultimately settled [Record at 253–254].

62. The Third Mortgage provides for a maximum amount of recoverable attorneys' fees equal to 3% of the debt. [Joint Exhibit Binder, Exhibit "B", Third Mortgage, at 17.]

63. The Note also provides for a maximum amount of recoverable attorneys' fees equal to 3% of the debt. [Joint Exhibit Binder, Exhibit "A", Note at 7-8.]

64. The Third Mortgagee is requesting attorneys' fees of $239,000.00 consisting of approximately $222,000.00 in total compensation and $17,000.00 for disbursements incurred. This request reflects a premium of almost 19%, or $36,000.00, in excess of the normal fee based on the usual hourly billing rates, i.e., $186,661.90 [Record, at 164–167].

65. This Court has denied the Third Mortgagee's request for a 19% bonus for legal fees. [See supra at 184.]

## DISCUSSION

### I. THE CONFESSION OF JUDGMENT

Before addressing the issue of the applicability of the default interest rate, a threshold issue to be determined by this Court is the validity and enforceability in these bankruptcy proceedings of the Confession of Judgment obtained by the Third Mortgagee.

■ The Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts as well as state courts to give state judicial proceedings "the same full faith and credit ... as they have by law or usage in the courts of such State ... from which they are taken." *Parsons Steel v. First Alabama Bank*, 474 U.S. 518, 519, 106 S.Ct. 768, 769, 88 L.Ed.2d 877 (1986). The Second Circuit acknowledges the preclusive effect of the Full Faith and Credit Act. "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so...." *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980); *see also, Kelleran v. Andrijevic*, 825 F.2d 692, 694 (2d Cir.1987), *cert. denied*, 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988). An exception to the Full Faith and Credit Act exists where the state court judgment was obtained by collusion, fraud or where the rendering court lacked jurisdiction. *Kel-*

*leran v. Andrijevic, supra,* 825 F.2d at 694.

With this in mind, a determination must be made as to the validity the Confession of Judgment would enjoy in the Pennsylvania courts.

A statutory scheme which provides for confession of judgments is seemingly one-sided. Under such a scheme, a creditor is contractually given the power of attorney of the obligor to obtain a state court judgment against the obligor, without notice to the obligor, upon an event of default. The obligor will be notified of the judgment only after it has already been issued. Since provisions of this nature have been attacked as violative of the Due Process clause found in the Fourteenth Amendment, many states have either refused to adopt such legislature or have withdrawn altogether existing similar legislature. Pennsylvania, however, is one of a few states which maintains this statutory scheme. Rule 2951 of the Pennsylvania Rules of Civil Procedure provides the method for entering a confession of judgment:

   (a) The prothonotary shall enter judgment by the confession on a note, bond, or other instrument by an attorney at law or other person against the person who executed it in favor of the original holder or, unless expressly forbidden in the instrument and a certificate of residence of the plaintiff and of the defendant, without the agency of an attorney and without the filing of a complaint, for the amount which may appear to due from the instrument. The judgment may include interest computable from the instrument.

   (b) If judgment by confession is authorized by the instrument but may not be entered by the prothonotary under subdivision (a), an action shall be commenced by filing with the prothonotary a complaint substantially in the form provided by Rule 2952. Even though the instrument is one on which judgment could be entered by the prothonotary under subdivision (c), the plaintiff may proceed under this subdivision.

The Third Mortgagee properly filed its Complaint pursuant to Pennsylvania civil procedure, and the judgment was entered by the prothonotary on September 2, 1986.

The Supreme Court has, in two separate opinions, spoken to the constitutionality of cognovit and confessed judgments. *See, D.H. Overmyer Co., Inc. v. Frick Co. ("Overmyer"),* 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972); *Swarb v. Lennox ("Swarb"),* 405 U.S. 191, 92 S.Ct. 767, 31 L.Ed.2d 138 (1972), *reh'g denied,* 405 U.S. 1049, 92 S.Ct. 1303, 31 L.Ed.2d 592 (1972).

In *Overmyer, supra,* the Supreme Court upheld the constitutionality of an Ohio statutory scheme whereby a party could obtain a cognovit judgment. The Court held that a "cognovit clause is not, *per se,* violative of Fourteenth Amendment due process." *Overmyer,* 405 U.S. at 187, 92 S.Ct. at 783. The Court emphasized that the enforceability of such judgments hinges on the particular facts of each case. *Id.* 405 U.S. at 188, 92 S.Ct. at 783. Specifically, the Court stated that "where the contract is one of adhesion, where there is great disparity in bargaining power, and where the debtor receives nothing for the cognovit provision, other legal consequences may ensue." 405 U.S. at 188, 92 S.Ct. at 783. Given the facts in *Overmyer,* the Court let the cognovit judgment stand where the parties were sophisticated corporations, involved in a commercial transaction and where ample evidence was shown that the debtor "voluntarily, knowingly, and intelligently" waived his rights to notice and a hearing prior to the entry of a civil judgment. 405 U.S. at 187, 92 S.Ct. at 783.

In *Swarb, supra,* the Supreme Court addressed a constitutional attack on the same Pennsylvania statutory scheme providing for confession of judgments which is at issue before this Court. Although adopting its holding in *Overmyer,* the Court in *Swarb* reached a contrary result due to the factual differences in the cases. Whereas *Overmyer* was decided in the context of two sophisticated corporations with equal bargaining power involved in a commercial transaction, *Swarb* was decided in the context of consumer financing agreements en-

tered into by individuals presumably unfamiliar with the law and the legal process. The Court in *Swarb* carved out an exception to the decision in *Overmyer:* the Pennsylvania Practice of confessing judgment is unconstitutional as to individual natural persons with annual incomes of more than $10,000 annually and who signed consumer financing or lease contracts containing cognovit provisions. *Swarb, supra,* 405 U.S. at 199–200, 92 S.Ct. at 771–772. While the financial limits imposed in the 1972 *Swarb* decision are outdated, it clearly reflects an underlying public policy seeking to protect innocent and unknowing low-income individual consumers from unknowingly waiving their due process rights. This evil, which the Court sought to prevent in *Swarb,* is most prevalent in consumer transactions given the lack of legal knowledge and bargaining power on the part of average, low-income consumers and the fact that very often the creditors use pre-printed consumer contracts containing clauses providing for confessed judgments. While acknowledging that the Pennsylvania statutory scheme is harsh, the Court in *Swarb* held that it was up to the state "legislative mill" to eliminate such practice. *Id.,* 405 U.S. at 202, 92 S.Ct. at 773. Except for prohibiting execution on "residential mortgage obligations," Act 6, 41 P.S. § 407, Pennsylvania legislation has not changed these Rules.

█ In light of these two Supreme Court decisions, the Pennsylvania state courts must recognize the constitutionality and enforceability of confessed judgments where there has been an intentional, knowing and voluntary waiver of the right to notice and a hearing before a civil judgment is entered. *See Federman v. Pozsonyi,* 365 Pa.Super. 324, 329, 529 A.2d 530, 533 (1987) (the Superior Court of Pennsylvania upheld the constitutionality of a con-

fessed judgment where there had been a "voluntary, knowing and intelligent waiver of the party's due process rights.")

PCH claims that its due process rights were violated inasmuch as it was not afforded a hearing by the Pennsylvania court prior to the entry of the Confession of Judgment, to judicially determine whether it had properly waived its due process rights. In support of this position, PCH cites to *In re Souders,* 75 B.R. 427 (Bankr. E.D.Pa.1987), which held that the Pennsylvania statutory scheme providing for confessed judgments is facially unconstitutional because the statute does not require that a hearing be held, prior to the entry of the judgment, to determine the waiver issue.[4] *Id.* at 436. In so holding, the *Souders* court followed the lead of the court in *Osmond v. Spence ("Osmond"),* 327 F.Supp. 1349 (D.Del.1971), *vacated,* 405 U.S. 971, 92 S.Ct. 1189, 31 L.Ed.2d 245 (1972).[5] The court in *Osmond* held that a Delaware statute allowing for confessions of judgments, similar to the Pennsylvania scheme, was unconstitutional in that it failed to provide for a pre-judgment hearing to determine whether there was an effective waiver. *Id.* at 1359. Following suit, the court in *Virgin Islands Nat'l Bank v. Tropical Ventures, Inc.,* 358 F.Supp. 1203 (D.V.I.1973) required an evidentiary hearing to determine whether the waiver was knowingly and voluntarily made before it would enter a confession of judgment. *Id.* at 1206. The *Virgin Islands* court stated that "due process [required] ... at least the opportunity to examine [the waiver] ... issue judicially." *Id.* at 1207.

While the ultimate common goal of the courts in *Osmond* and its progeny are laudable, they are not controlling here. First, given that the Supreme Court has already spoken to the constitutionality of the Penn-

---

**4.** Note that there exists case authority from the federal courts sitting in Pennsylvania which indicate that the *Souders* decision, since it has not been overruled, is good law: *In the Matter of FRG, Inc.,* 114 B.R. 75, 79 (E.D.Pa.1990); *In re Fricker,* 113 B.R. 856, 864 (Bankr.E.D.Pa.1990); *In re Beck–Rumbaugh Assoc., Inc.,* 103 B.R. 628, 633 (Bankr.E.D.Pa.1990).

**5.** The *Osmond* decision was vacated and remanded to the District Court of Delaware for further consideration in light of the *Swarb* and *Overmyer* decisions. Upon reconsideration, the District Court of Delaware adhered to its prior conclusions. *Osmond v. Spence,* 359 F.Supp. 124 (D.Del.1972).

sylvania statutory scheme regarding confessed judgments, the *Souders* decision cannot be given any weight to the extent that it attempts to overrule the Supreme Court.[6] Second, the *Osmond, Virgin Islands* and *Souders* decisions demonstrate the discretionary powers of courts to address the waiver issue at a separate judicial hearing where there is a deficiency of facts before the court.

The Supreme Court of Pennsylvania in the wake of the Supreme Court decisions has required a showing of a voluntary, intelligent and knowing waiver but has not required a separate evidentiary hearing on the waiver issue prior to the entry of the confessed judgment. *Federman v. Pozsonyi, supra.*, 365 Pa.Super. at 329, 529 A.2d 530; *accord, Chittester v. LC–DC–F Employees,* 384 F.Supp. 475, 479 (W.D.Pa. 1974) (the court held that "the meaningful time for the opportunity to be heard on any defense [to a confession of judgment] is prior to any proceedings to *execute* on the judgment") (emphasis added); *see also, North Penn Consumer Discount Co. v. Shultz,* 250 Pa.Super. 530, 536, 378 A.2d 1275, 1278 (1977) (court held that due process had been provided where maker had opportunity to be heard prior to execution of judgment). Naturally, where the evidence on the waiver issue is lacking and insufficient for the Court to make a determination, a separate evidentiary hearing on that issue will be necessary. Accordingly, this Court must determine whether there is sufficient evidence as to the issue of whether PCH properly waived its due process rights.

This case presents facts similar to those found in *Overmyer*. Like in *Overmyer*, the parties at bar are sophisticated parties involved in a commercial transaction dealing in large sums of money. PCH, represented by competent counsel, negotiated the drafting of the clauses contained in the Confession of Judgment. The Agreement, a complicated and sophisticated instrument, demonstrates that PCH had bargaining power in the negotiation process. For example, PCH obtained an interest rate on the Third Mortgage below what was originally intended. Of course, the Third Mortgagee was in return compensated for the lower interest rate through the creation of the Second Part in the Agreement. But, nevertheless, this clearly reflects the meticulous negotiation process that took place between the parties. The Court in *Overmyer* noted that the confession of judgment procedure serves a "proper and useful purpose in the commercial world." *Overmyer, supra,* 405 U.S. at 188, 92 S.Ct. at 783. The instant case is just one example of the intended usefulness of confessed judgments. Accordingly, there is sufficient evidence to establish an effective waiver by PCH.

PCH further posits that the Confession of Judgment is not entitled to full faith and credit because cognovit judgments are only nominally judgments. In support of this position, PCH cites to, *inter alia,* a 1969 decision from the Court of Appeals of New York, *Atlas Credit Corp. v. Ezrine,* 25 N.Y.2d 219, 303 N.Y.S.2d 382, 250 N.E.2d 474 (1969). In *Atlas,* the Court refused to enforce a Pennsylvania cognovit judgment finding those types of judgments to be in violation of New York public policy. The Court in *Atlas* held that cognovit judgments were not judgments arising from controversies over matters submitted for judicial determination and, therefore, not mandated for full faith and credit pursuant to local policy. *Id.* 303 N.Y.S.2d at 391, 250 N.E.2d at 481.[7] In so holding, however, the court in *Atlas* recognized that it was going against another New York case, *Teel v. Yost,* 128 N.Y. 387, 28 N.E. 353 (1891), which held that a cognovit judgment entered in and valid in Pennsylvania is entitled to full faith and credit in New York. The United States Supreme Court has inti-

6. Including the decisions by the federal courts sitting in Pennsylvania, *see infra* n. 4.

7. In a later case, the New York State court in *Mallan v. Samowich,* 94 A.D.2d 249, 97 A.D.2d 364, 464 N.Y.S.2d 122 (1 Dept.1983) *appeal dis-* *missed,* 67 N.Y.2d 871, 501 N.Y.S.2d 1029, 492 N.E.2d 795 (1986), in dicta stated that a cognovit judgment is not entitled to full faith and credit in New York, and cited the *Atlas* case in support thereof. *Id.* 464 N.Y.S.2d at 125.

mated that cognovit judgments, if valid in the issuing state, are to be accorded full faith and credit and will be enforced unless the terms of the warrant of attorney have not been fully complied with. *See, Nat'l Exch. Bank of Tiffin v. Wiley*, 195 U.S. 257, 25 S.Ct. 70, 49 L.Ed. 184 (1904); *Grover & Baker Sewing Mach. Co. v. Radcliffe*, 137 U.S. 287, 11 S.Ct. 92, 34 L.Ed. 670 (1890). The validity of the reasoning in the *Atlas* decision is questionable in light of the Supreme Court decisions, *Overmyer*, *supra*, and *Swarb*, *supra*. *See, Money Management, Inc. v. Vetere*, 107 Misc.2d 861, 436 N.Y.S.2d 158 (N.Y.City Civ.Ct. 1981). The Supreme Court has clearly refused to bar the use of the cognovit judgments. The Court has, however, sought to curb the possible abuse inherent in this kind of statutory scheme. This Court feels that a confession of judgment or cognovit judgment shall enjoy full faith and credit protection to the extent that it was not procured by collusion, fraud or where the rendering court has jurisdiction. *See also, Klecha v. Bear*, 712 F.Supp. 44, 47 (M.D. Pa.1989) (wherein the court gave a confession of judgment preclusive effect); *In the Matter of Jarrett*, 71 B.R. 123, 124 (Bankr. N.D.Ohio 1987) (where the bankruptcy court sitting in the Northern District of Ohio, gave preclusive effect to the judgment obtained by confession under warrant of attorney); *cf., Money Management, Inc. v. Vetere*, *supra*, 436 N.Y.S.3d at 161 (New York court refused to give full faith and credit to Pennsylvania confessed judgment where such recognition would give the judgment greater recognition than it would enjoy in the Pennsylvania courts.)

█ PCH further attacks the enforceability of the Confession of Judgment claiming that the issuing state court lacked subject matter jurisdiction. The parties entered into the Drop Dead Stipulation which lifted the automatic stay. PCH reads the Drop Dead Stipulation as permitting the Third Mortgagee only to execute on its collateral but not to proceed with the confession of judgment proceedings. Mr. Turner, who participated in negotiating the Drop Dead Stipulation on behalf of PCH testified:

Q. Was there any discussion in connection with entering into this agreement regarding fixing the amounts of the debt or permitting the mortgagee to fix the amount of the debt under the Third Mortgagee?

A. None whatsoever....

[Record at 257].

Despite Mr. Turner's testimony, the Drop Dead Stipulation provides that:

... on September 1, 1986, without the need of further Order of this Court, the Third Mortgagee shall have relief from and shall no longer be found by the provisions of the automatic stay, and on that date the third mortgagee shall have the right to exercise all rights to execute on the collateral *to the same extent as if these bankruptcy proceeds [sic] were not pending....* (Emphasis added)

This language clearly authorizes the Third Mortgagee to pursue its rights as if a bankruptcy petition were not pending, including its right to confess judgment. Therefore, the broad language in the Drop Dead Stipulation had the effect of lifting the automatic stay and allowing the Third Mortgagee to confess judgment against PCH. Accordingly, the state court had subject matter jurisdiction.

PCH additionally attacks the validity of the Confession of Judgment claiming that it was procured by fraud. As noted earlier, where a judgment is procured by fraud it will not be given full faith and credit (*supra* at p. 192). In support of this theory, PCH alleges that the Third Mortgagee knowingly made a misrepresentation to the Pennsylvania court, through counsel, as to entitlement to post-petition default interest under the mortgage, based on post-bankruptcy acceleration. Additionally, PCH adds that the Third Mortgagee omitted from its calculation no less than $351,-871.40 due PCH by way of credit for the reduction amounts. The fact that this allegation is a far stretch, is evidenced by its short mention in PCH's briefs. PCH's allegations do not give rise to any inference or implication of fraud by the Third Mortgagee. First, as is discussed in more detail

further on in this decision, the Third Mortgagee's theory of post-filing acceleration is not completely unfounded. Moreover, it seems that at the time that the Third Mortgagee confessed judgment, it had good reason to believe that PCH was not entitled to certain reductions in the interest since the First and Second Mortgages had not been paid. Accordingly, PCH's motion to set aside the Confession of Judgment due to fraud on the part of the Third Mortgagee is denied.

■ The Third Mortgagee claims that the Confession of Judgment should be given preclusive effect because PCH never attempted to strike open the judgment as allowed under the Pennsylvania Rule of Civil Procedure 2959. *See Leasing Service Corp. v. Benson,* 317 Pa.Super. 439, 451, 464 A.2d 402, 408 (1983) (the court found that "[a] petition ·to open is the proper procedural tool for a confession judgment debtor to utilize to contest the amount of the judgment."); *Van Arkel & Moss Properties, Inc. v. Kendor,* 276 Pa.Super. 547, 551, 419 A.2d 593, 595 (1980) (the court held that "[w]here the complaint procedure is followed, the plaintiff need only aver a default and allege the amounts due; a challenge to the accuracy of such amounts can be resolved by a petition to open the judgment.") PCH can, however, still seek to strike open the Confession of Judgment since the rules do not set a time frame within which PCH must act. Pa.R.Civ.P. 2959(e) (Amend.1973); *see, also, Klecha v. Bear, supra.,* 712 F.Supp. at 48 (M.D.Pa. 1989). The Third Mortgagee is asking this Court to treat as final a judgment which is still subject to PCH's attack in state court. It is, however, questionable whether PCH could have or should have moved to strike open the Confession of Judgment where the basis of the motion would be on the interpretation of federal bankruptcy law. More specifically, PCH is asking this Court to determine the allowability of the Third Mortgagee's claim. This issue should properly be addressed by a bankruptcy court since it has exclusive original jurisdiction over bankruptcy proceedings as well as over the allowability of claims in bankruptcy proceedings. *See,* 11 U.S.C. §§ 502(a), 506(b); 28 U.S.C. § 1334(a). Since PCH's motion deals with the allowability of the Third Mortgagee's claim, and since PCH's time to strike open has not yet expired, this Court will review the Confession of Judgment in light of the provisions of the Code.

## II. THE DEFAULT INTEREST RATE

The next issue is whether the Third Mortgage is entitled to interest at the predefault rate of 8% or at the post-default rate of 12%. As a threshold matter, the parties disagree as to the interpretation of the Note regarding when the default interest takes effect. The Third Mortgagee reads the Note as triggering the default interest rate automatically following the occurrence of an "Event of Default" irrespective of an acceleration. PCH, on the other hand, construes the operative language found in the Note as requiring that acceleration occur before the default interest rate takes effect.

The Note provides, in part, as follows: Any one of the following shall constitute an Event of Default hereunder, upon the occurrence of which the entire unpaid balance of principal, at the option of the holder of this Note, shall become immediately due and payable:
(a) the failure of Maker to make any payment of principal or interest within ten (10) days of notice thereof....

\* \* \* \* \* \*

Following the occurrence of an Event of Default, interest shall accrue on the principal amount hereof at the rate of twelve percent (12%) per annum and shall be payable upon demand.

(Note at 6, 7.)

[6] The parties concede that pursuant to well-established principles of contract interpretation, the Note must be construed so as to give effect to all of its provisions. *First Philadelphia Realty Corp. v. Albany Sav. Bank,* 609 F.Supp. 207, 210 (E.D. Pa.1985).[8] "Accordingly, contracts must be read, if possible, in a fashion so as to

---

**8.** It is undisputed that the Note and Third Mortgage are governed by Pennsylvania law.

give meaning to every part of a contract and should attempt to read all provisions as being compatible wherever possible." *Shipping Corp. of India, Ltd. v. Sun Oil Co.*, 569 F.Supp. 1248, 1254 (E.D.Pa.1983); *Brennan v. D.J. McNichol Co.*, 439 F.Supp. 499 (E.D.Pa.1977).

■ This Court cannot see the ambiguity in the Note regarding the default interest rate.[9] Clearly, the Second Part bears no interest prior to its maturity or acceleration, whichever occurs first. The First Part, however, bears a contractual interest rate of 8%. This Court reads the language in the Note as requiring that the 12% default interest rate apply to the First Part in the "Event of Default," which could lead to acceleration, but that interest not accrue on the Second Part until acceleration or maturity. PCH's interpretation, that the default interest rate can only apply pursuant to acceleration because interest on the Second Part accrues upon maturity or acceleration, is too restrictive and runs contrary to common commercial practice. It is not uncommon to find in debt instruments terms which require the obligor to pay a higher interest rate in the event of a late payment which constitutes a technical default under the obligation. But, despite the fact that said obligor is in default, acceleration of the debt, if it is provided for in the obligation, need not be automatic upon default but rather may occur upon the creditor's option to accelerate. In the instant case, the default interest rate is triggered as to the First Part upon ten (10) days' notice of PCH's failure to make a timely payment. The Third Mortgagee has the option to accelerate the entire debt, in which event interest would accrue on both the First and Second Parts, or simply accept the missed payments, albeit late, at a higher interest rate to compensate for the time value of money. The Third Mortgagee seeks to collect the post-default interest as of the Filing Date.[10] PCH failed to make its scheduled payment on October 1, 1984 and the Third Mortgagee sent the Notice of Default, dated October 15, 1984. Accordingly, based on the pleadings, the Third Mortgagee would have been entitled, if at all, to post-default interest as of the Filing Date.

■ The next issue that must be addressed is whether under section 506(b) of the Code, the default interest rate applies to payments missed post-petition. Section 506(b) provides as follows:

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b). Section 506(b) does not automatically entitle oversecured creditors to interest calculated on the higher post-default interest rate found in the agreement from which the claim arose. There are two lines of cases dealing with the accrual of default interest on payments missed post-petition: those cases allowing for default interest[11] and those denying its allowance.[12] There is no need to make a determination as to this issue because even if arguendo the Third Mortgagee were entitled to default interest commencing as of

---

9. Since this Court has not found the terms of the Note ambiguous, there is no need to inquire as to the meaning according by the conduct of the parties.

10. Note—The Third Mortgagee's motion to amend Complaint to assert that the post-default interest rate was triggered automatically at a time prior to the Filing Date was denied. (*See supra* at 184).

11. *In re Colegrove*, 771 F.2d 119 (6th Cir.1985); *In re Consolidated Operating Partners*, 91 B.R. 113 (D.Colo.1988); *In re Skyler Ridge*, 80 B.R. 500 (Bankr.C.D.Cal.1987); *In re Schaumburg Hotel Owner Ltd., Partnership*, 97 B.R. 943 (Bankr.N.D.Ill.1989); *In re White*, 88 B.R. 498 (Bankr.D.Mass.1988); *In re 360 Inns, Ltd.*, 76 B.R. 573 (Bankr.N.D.Tex.1987); *In re Arlington Village Partners Ltd.*, 66 B.R. 308 (Bankr.S.D. Ohio 1986).

12. *In re W.S. Sheppley & Co.*, 62 B.R. 271 (Bankr.N.D.Iowa 1986).

the filing of the bankruptcy petition,[13] PCH defeated this claim by curing the defaults pursuant to §§ 1123 1124(2) and (3) and 1129 of the Code.

Usually, the concept of cure arises in the context of the deacceleration of debt and the reimbursement of the terms of the agreement. That is, most courts seem to be in accord that section 1124(2) permits the debtor to deaccelerate any debt that has been accelerated because of a default, and to reinstate the terms of the agreement. *See, In re Southeast Co.*, 868 F.2d 335 (9th Cir.1989); *In re Taddeo*, 685 F.2d 24 (2d Cir.1982); *In re Manville Forest Prod. Corp.*, 43 B.R. 293 (Bankr.S.D.N.Y. 1984) *aff'd in part and rev'd in part on other grounds*, 60 B.R. 403 (S.D.N.Y.1986).

■ The Note, however, was not accelerated pursuant to its terms as of the Filing Date. A post-filing acceleration of the Note, would clearly have violated the automatic stay of section 362 of the Code and, therefore, would have been null and void. *See, In re Grant Broadcasting of Philadelphia, Inc.*, 75 B.R. 819, 823 (E.D. Pa.1987); *In re Manville Forest Prod. Corp., supra.*, 43 B.R. at 298 n. 5. There is case law, however, from the Ninth Circuit Court of Appeals which contravenes the general assumption that in order for the cure provision of the Code to apply the defaults must result in acceleration of the debt. *See In re Southeast Co.*, 868 F.2d 335 (9th Cir.1989); *In re Entz–White Lumber and Supply, Inc.*, 850 F.2d 1338 (9th Cir.1988). The courts in these cases have held that the cure provisions found in the Code are not applicable only where defaults result in acceleration of remaining payments due. *In re Southeast Co., supra*, 868 F.2d at 338; *In re Entz–White Lumber and Supply, Inc., supra*, 850 F.2d at 1341. These Ninth Circuit cases are the only ones in which this issue was specifically raised; in the other cases dealing with cure of defaults, acceleration of the debt had occurred. If this Court were to adopt the view espoused by the Ninth Circuit, the

fact that the Note was not accelerated would not bar PCH from utilizing the cure provisions found in the Code. Since the grounds upon which the 9th Circuit decisions are based are subject to much attack, this Court chooses not to rely on those lines of cases.

■ The Note may be deemed to have been accelerated, however, for purposes of calculation of the Third Mortgagee's claim in these bankruptcy proceedings. Courts have made a distinction between acceleration of a debt upon the filing of the bankruptcy petition for the purpose of the filing of a proof of claim in a case, *In re Texaco, Inc.*, 73 B.R. 960, 966 (Bankr.S.D.N.Y. 1987), *In re Manville Forest Prod. Corp., supra*, 43 B.R. at 297, and acceleration for the purpose of taking actions against a debtor in violation of the automatic stay, *In re Texaco, supra*, 73 B.R. at 966; *In re Manville Forest Products Corp., supra*, 43 B.R. at 298. This distinction is noted in the Code's legislative history:

> Section 502(b) thus contains two principles of present law. First, interest stops accruing at the date of the filing of the petition, because any claim for unmatured interest is disallowed under this paragraph. Second, bankruptcy operates as the acceleration of the principal amount of all claims against the debtor.

Sen. Rep. No. 989, 95th Cong., 2nd Sess. 63 (1978); H.R.Rep. No. 595, 95th Cong. 1st Sess. 353 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5849, 6309.

Therefore, clearly had the Third Mortgagee filed a proof of claim for the entire accelerated principal amount, the Note could be deemed accelerated for purposes of deacceleration. The Third Mortgagee, however, failed to file a proof of claim in these proceedings.

This automatic acceleration, however, occurs not only where a creditor files a proof of claim for the entire accelerated amount but also where a creditor files a motion seeking relief from the automatic stay for the purpose of foreclosure. *See, In the*

---

**13.** This is the only time that the default interest could have commenced to accrue given this Court's denial of the Third Mortgagee's motion to amend its complaint to assert that it was triggered at a time prior to the filing of the bankruptcy petition. (*See, supra,* at 184).

*Matter of LHD Realty Corp.*, 726 F.2d 327 (7th Cir.1984) (court treated mortgage accelerated where mortgagee sought relief from the automatic stay in order to foreclose on the mortgage). This is true because by seeking to lift the automatic stay, the mortgagee is demonstrating its intention to collect on its entire accelerated debt, as it does when it files a proof of claim for the entire accelerated amount. *See also, In re Skyler Ridge, supra* at n. 11, 80 B.R. at 507. The Third Mortgagee filed a motion for relief from the automatic stay to permit it to foreclose on the Third Mortgage. (*See, supra* at 186). Accordingly, the Third Mortgage will be treated as having been accelerated for purposes of calculations of the Third Mortgagee's claim against PCH. This acceleration is subject to being undone by the cure provisions found in the Code.[14] *In the Matter of LHD Realty Corp., supra.*, 726 F.2d at 332; *In re Texaco, Inc., supra.*, 73 B.R. at 966; *In re Skyler Ridge, supra.*, 80 B.R. at 507.

The more common case scenario of cure of defaults is where the debtor's proposed plan provides for the payment of all missed payments and the reinstatement of the original maturity date of the obligation. The facts before this Court, however, fall within the gray area where a debtor's proposed plan contemplates a sale of the creditor's collateral and prepayment of the entire debt out of the sale proceeds. PCH, at

the closing, fully paid the Third Mortgagee the principal plus the pre-default contract interest.[15] The Note was scheduled to mature at a time after the Filing Date and after the closing. The Third Mortgagee posits that given these facts, PCH's actions did not constitute a cure and deacceleration of the debt and, thereby, did not relieve PCH from paying the default interest.

A resolution of these issues requires a look at section 1124 of the Code which sets forth the definition of "impairment" of a claim or interest within a debtor's plan of reorganization. Generally, a claim or interest is not deemed to be impaired if the debtor's proposed plan leaves unaltered the holder's legal, equitable and contractual rights. *See* 11 U.S.C. 1124(1). Notwithstanding this, section 1124(2) of the Code deems a claim or interest unaltered where the proposed plan seeks to cure any existing defaults, both pre-petition and post-petition, reinstate the maturity and compensate the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law. The Senate Report on section 1124 sheds light on Congress's rationale for the power to "deaccelerate":

> a claim or interest is unimpaired by curing the effect of a default and reinstating the original terms of an obligation

---

**14.** Section 1123(a)(5) provides:
(a) Notwithstanding any otherwise applicable non-bankruptcy law, a plan shall—
(5) provide adequate means for the plan's implementation, such as—
\* \* \* \* \* \*
(D) sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;
\* \* \* \* \* \*
(G) curing or waiving of any default
11 U.S.C. § 1123(a)(5).
Section 1124 provides:
Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
\* \* \* \* \* \*
(2) notwithstanding any contractual provision or applicable law that entitles the holder

of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—
(A) cures any default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2);
(B) reinstates the maturity of such claim or interest as such maturity existed before such default;
(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and
(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest;....
11 U.S.C. § 1124(2).

**15.** Subject to certain adjustments to be made.

when maturity was brought on or accelerated by the default. The intervention of bankruptcy and the defaults represent a temporary crises which the plan of reorganization is intended to clear away. The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain. Curing of the default and the assumption of the debt in accordance with its terms is an important reorganization technique for dealing with a particular class of claims, especially secured claims.

S.Rep. No. 989, 95th Cong., 2d Sess. 120, reprinted in U.S. Code Cong. & Admin. News 1978, pp. 5787, 5906. A debtor is deemed to have cured all defaults where the parties are put in the same positions they enjoyed immediately before the default occurred thereby nullifying the consequences of default. *In re Taddeo, supra,* 685 F.2d at 26–27; *In re Forest Hills Associates,* 40 B.R. 410, 415 (Bankr.S.D.N.Y. 1984).

■ The court in *In re Centre Court Apartments, Ltd.,* 85 B.R. 651 (Bankr.N.D. Ga.1988), in dicta, stated that the Code's cure provision would not apply where a debtor's plan seeks to simply liquidate an obligation rather than reinstate the original maturity date of obligation. *Id.* at 659.[16] The plan before the court in *Centre Court* provided for the cure of defaults and reinstatement of the maturity of the obligation. The debtor, however, paid the debt in full the very next day after the debtor had cured and reinstated the obligation. The debtor in *Centre Court* and PCH achieved the same end result: the prepayment in full of their loan obligations. In terms of methods, PCH did in one step what the debtor in *Centre Court* achieved in two. PCH could have sought to reinstate the Note and Third Mortgage only to immediately thereafter pay it off. This Court

cannot see the purpose of elevating form over substance. PCH did what was fully within its powers to do under the terms of the Note. In fact, the Note provides for a discount in principal in the event of prepayment prior to October 1, 1987. The Third Mortgagee received the benefit of its bargain. Accordingly, PCH has cured all defaults and deaccelerated the debt and is entitled to be relieved from paying interest at the post-default rate.

## III. THE REDUCTION AMOUNTS

■ On another front, the parties disagree as to the applicability of certain reduction amounts provided for in the Note to be applied to the 8% pre-default interest (*see supra,* FACTS ¶ 26 at 187). The reduction amounts were intended to be applied to the interest due. Naturally, PCH seeks the application of the reduction amounts. The Third Mortgagee refuses to apply the amounts on the grounds that the purpose for which they were created would not be served.

The reduction amounts were created as a means to alleviate the burden of paying increased interest rates on the First and Second Mortgages. The Third Mortgagee would receive less than the contractual 8% interest over the life of the Note. In turn, the reduction amounts were to be applied to the Second Part of the principal.

Mr. Turner, President and General Partner of PCH, testified:

Q. Stopping for the moment on the second part, what is your understanding of the relationship, if any, of the second part to the reductions listed on Page 3 of the note, Exhibit A?

A. There came a time in the deal, the negotiation and moving toward closing of the deal to buy the hotel, that it was determined that the first mortgagee and the second mortgagee would be raising

**16.** In a recent decision, *In re 433 South Beverly Drive,* 117 B.R. 563, 566 (Bankr.C.D.Cal.1990), the court was confronted with an issue almost identical to the one before this Court and held that the Code's cure provisions apply where the debtor conducts a § 363 sale of the property and prepays the loan obligation. This Court chooses not to rely on that decision since it is premised on a legal conclusion articulated by the court in *In re Entz–White Lumber and Supply Inc., supra,* that section 1124 applies even where an acceleration of the debt has not occurred, which this Court does not rely on herein.

the interest rates under those mortgages by, I believe, two percent.

Our original negotiation was that the first and second mortgages would be assigned to us as they stood.

When we came to the realization that there would be a higher interest rate, a new negotiation had to be entered into because we did not have the cash flow in our analysis of the deal to cover the additional interest, nor did we necessarily want to incur that cost.

It was an additional cost to the deal.

There were negotiations and basically there was a significant tradeoff.

The seller agreed to provide us with the cash flow to make those additional interest payments, and the way they were providing us with the cash flow was to reduce, give us reductions in the interest that would otherwise be due them.

*In return for that we gave them a negotiated reimbursement for giving us that cash flow when we need it.*

*The reimbursement was the second part of the mortgage.*

*So that they were giving us the cash flow, we were returning it to them on the maturity of the purchase money mortgage.*

Q. And that returned amount is what's called second part, $468,698, correct?

A. Precisely, yes.

[Record 239–241 (emphasis added)].

The causal relationship between the added amounts of interest on the First and Second Mortgages, the reduction or credits on the Third Mortgage and the reimbursement as additional principal, *i.e.*, the Second Part of principal, is confirmed by the Third Mortgagee's own witness:

When the lenders on the first and second mortgages said that they would only permit such assumption [of the First and Second Mortgages] with an increased interest rate, the buyers' response was, "This throws our numbers off from what we were figuring on," and they then negotiated with Mr. Gilbert and his associates these paragraphs to provide for a reduction in the quarterly payments.

So as an indirect relationship, these numbers are not directly related, the numbers are not directly related, but the relationship is; that because Simon Associates, Mr. Gilbert and Mr. Tye and the other sellers were willing to give these reductions in the regular quarterly payments, *they then negotiated some additional compensation to be paid by the buyer to the seller at a later date in respect of them foregoing current cash collections, and in so foregoing, assisted the purchaser in improving its potential cash flow in operating the property.*

Q. So there's a causal relationship between the higher amounts that the buyer, PCH, had to pay on the first and second mortgages, there's a causal relationship between that increase and the amounts listed in Paragraphs (a) and (b), and as I understand—is that correct, causal relationship?

A. Yes, I believe that's correct.

Q. And the agreement of the parties that you referred to a moment ago, as I understand it, again, is that *to the extent the third mortgagee was going to accept reduced payments measured in some causal relationship with the increased payments on the first and second, that amount would effectively be made up at the end by what you call the additional compensation later, is that correct?*

A. *The second part of the principal, yes.*

Q. *That was the concept as I understand it, yes, sir.*

[Record 145–147 (emphasis added)].

Thus, the reductions to interest (in the form of the "reduction amounts") and concomitant reimbursement therefor (in the form of the Second Part of principal) represented a negotiated business agreement between PCH and the Third Mortgagee directly resulting from the increased amounts PCH was required to pay the First and Second Mortgagees. PCH was entitled to reductions in the amount of pre-default *interest* under the Note and Third Mortgage and was required to pay-back or

reimburse the Third Mortgagee for these reductions as principal. There is no evidence to indicate that in order to receive full credit for the reduction amounts under the Note, PCH was required to make timely payment on account of the First and Second Mortgages. All that was required was that the added amounts actually be paid to the First and Second Mortgagees [Record at 145–147, 239–241, 292].

The amounts paid to the First and Second Mortgagees at closing included the increased payments (based upon higher interest rates) that the First and Second Mortgagees bargained for when PCH bought the Hotel [Record at 289–290].

Accordingly, PCH is entitled to the reduction amounts aggregating $351,871.40.

## IV. THE THIRD MORTGAGEE'S REQUEST FOR ATTORNEY'S FEES AND REIMBURSEMENTS

PCH objects to the compensation and reimbursement to the Third Mortgagee of the fees and expenses of the Third Mortgagee's counsel to the extent that the fees exceed the maximum recoverable amount pursuant to the terms of the Third Mortgage and Note and to the extent that certain of the services were charged unnecessarily and were not clearly specified in the time sheets, and were duplicative and/or excessive.

The Third Mortgagee is seeking fees of $239,000 for services performed and expenses incurred.[17] In total, PCH seeks to reduce the Third Mortgagee's request for attorneys' fees by $143,000.00, which includes the 19% premium of $36,000.00 requested,[18] alleged non-compensable time totalling $98,000.00 and disbursements of

---

**17.** While the Third Mortgagee intimated in the Joint Pretrial Order that it sought an additional $50,000 in estimated fees incurred in this litigation, no reference is made to such additional fees in its Memorandum and Reply Memorandum.

**18.** This Court has already denied the request for a premium [Record at 164–167].

**19.** The *Chase Manhattan* court dismissed as specious the creditor's argument that the standard

---

$9,000.00 associated with the non-compensable time.

Section 506(b) codifies pre-Code law that an oversecured creditor can assert, as part of its secured claim, its right to interest, fees and costs arising under its credit agreement. S.Rep. No. 95–989, 95th Cong., 2d Sess. 68 (1978); H.Rep. No. 95–595, 95th Cong., 1st Sess. 356–357, U.S.Code Cong. & Admin. News 1978, pp. 5787, 5854, 6312–6313.

■■■ Pursuant to section 506(b), secured creditors are allowed a claim for "reasonable fees, costs or charges provided for under the agreement which such claim arose." 11 U.S.C. § 506(b). Reasonable is defined in part as: Just; proper. Ordinary or usual. Fit and appropriate to the end in view.... *Black's Law Dictionary*, 1432 (Revised 14th ed. 1968). This definition lays the foundation for a § 506(b) analysis. *See, e.g., In re Nicfur–Cruz Realty Corp.*, 50 B.R. 162, 167 (Bankr.S.D.N.Y.1985). Its adaptation to the bankruptcy context produces a standard which is relatively straightforward: whether the creditor's belief was reasonable that the fees were necessary. *Chase Manhattan Bank v. Wonder Corp. of America, (In re Wonder Corp. of America)*, 82 B.R. 186, 190 (D.Conn.1988).[19] The court in *In re Wonder Corp. of America*, 72 B.R. 580 (Bankr. D.Conn.1987), *aff'd*, 82 B.R. 186 (D.Conn. 1988), set forth the clearest and most comprehensive list of factors to be used in determining which fees meet this standard. The *In re Wonder Corp.* court considered the following nine factors in assessing the reasonableness of fee claims under § 506(b):

(1) whether the legal fees were authorized by the loan agreement;

should be "subjective and prospective" as opposed to "objective and retrospective." The court stated that these distinctions are without difference, and inaccurately describe the standard used by the bankruptcy court. For example, the determination is necessarily retrospective in that fee applications are made at the case's completion; yet, "inherent in the inquiry into reasonableness is a consideration of the necessity of the action *from the perspective of the time at which it was taken.*" 82 B.R. at 190–91 (emphasis added).

(2) whether they were necessary to the promotion of the client's interest;

(3) whether they are permitted under applicable law;

(4) whether they are compatible with the policy underlying the Bankruptcy Code;

(5) whether the time spent is appropriate to the complexity of the task;

(6) whether the hourly rate is appropriate under applicable standards;

(7) whether the tasks were assigned to the fewest and least senior attorneys able to render the services in a competent and efficient manner;[20]

(8) whether the fee should be adjusted to reflect duplicative services rendered by attorneys representing other parties with a common interest in the case; and

(9) whether the fee should be adjusted to reflect the court's observation of the nature of the case and the manner of its administration.

*Id.* at 588–89.

The size of a creditor's equity cushion is an underlying factor in the reasonableness determination, and must be assessed when considering the above factors. *Id.* If the equity cushion is large enough that there is no appreciable risk that a creditor will not be paid, courts will tend to view large fee claims as being exorbitant because there is no purpose in engaging in legal maneuvers. *Id.* at 580.

■ In the instant case, it is undisputed that the Third Mortgagee is an oversecured creditor falling within the ambit of § 506(b). Having established this, this Court must address the first factor: whether the legal services are authorized by the loan agreement. Both the Note and the Third Mortgage provide for recoverable attorneys' fees in the event that the Third Mortgagee confessed judgment against PCH. [Joint Exhibit Binder, Exhibit "A", Note at 7–8; Exhibit "B", Third Mortgagee at 17.] The recovery of attorneys' fees, however, is limited to 3% of the outstanding debt. PCH seeks to bind the Third Mortgagee's recovery in this bankruptcy proceedings to the 3% limitation.[21] While the Note and Mortgagee do provide a sufficient basis from which to authorize the payment of attorneys' fees and costs to the Third Mortgagee, the 3% limitation is not applicable in these proceedings. The Note and Third Mortgage contemplated the Third Mortgagee possibly seeking to confess judgment against PCH. In the event that the Third Mortgagee was successful, it would be entitled to attorneys' fees. The 3% limitation on attorneys' fees is appropriate in a confession of judgment provision where the obligor, in this case PCH, is bound by a judgment which is issued without the obligor's prior knowledge.[22] This provides the obligor a means by which it can, at any given moment, accurately assess its total indebtedness in the event the Third Mortgagee sought to confess judgment. The contractual provision regarding recoverable attorneys' fees evidences an intention by both parties to allow the Third Mortgagee to recoup its costs in defending its claim. In these bankruptcy proceedings, PCH is given a full and fair opportunity to attack the reasonableness and necessity of the fees and costs sought by the Third Mortgagee. Accordingly, the Third Mortgagee is allowed to recover attorneys' fees, subject to this Court's authorization,

---

**20.** On appeal, the district court noted that the law does not require the court to assign tasks to the fewest and least senior attorneys possible. The court held, however, that the bankruptcy court's reliance on this factor to surmise "grossly duplicative" task and services was appropriate, since "the underlying principle that counsel must attempt to spend its time in an efficient manner and to avoid excessive representation and duplication is obviously central to the [reasonableness] assessment...." *Id.*, 82 B.R. at 191–92 n. 7.

**21.** PCH calculates that the maximum the Third Mortgagee is entitled to, without consideration of the reasonableness of the fees, is $170,625 if the Note and Third Mortgage were to be mechanically applied. (Computed by multiplying the total principal of the First and Second Parts, plus interest calculated at 8%, less the reduction amounts of $5,687,522.21, times 3%.)

**22.** Indeed, the Confession of Judgment provides for attorneys' fees equalling 3% of the debt, as calculated therein.

but is not limited to recover 3% of the debt found in the Note and Third Mortgage.

PCH seeks to reduce the fees requested by the Third Mortgagee to the extent that they are for the following services: [23]

   (a) $16,000 for stay litigation at a time when there was substantial equity in property;

   (b) $3,500 in connection with the June 18, 1986 letter;

   (c) $4,500 incurred in fixing the amounts in the Confession of Judgment;

   (d) $30,000 incurred in dealing with the Liona bankruptcy proceeding;

   (e) $4,000 incurred in attending depositions in the Liona/PCH dispute; and

   (f) $30,000 for unspecified research and the unnecessary research and other activities set forth above.

The courts have used combinations of the remaining eight factors, which often overlap, to determine whether the creditor reasonably believed the services were necessary to protect its interest in the debtor's property. *United Merchants and Manufacturers, Inc. v. The Equitable Life Assurance Society of the United States*, 674 F.2d 134, 140 (2d Cir.1982). Services are generally disallowed though they might not be prohibited by law, when they seem to serve no legitimate purpose. *In re Wonder Corp., supra*, 72 B.R. at 591. The most common example is a fully-secured creditor's attempt to obtain relief from the automatic stay when the secured claim is not under threat because of the large equity cushion. *Id.* at 591–92. *See also, In re Tampa Chain Co., Inc.*, 53 B.R. 772, 782 (Bankr.S.D.N.Y.1985). Such an attempt has no realistic chance of success and only wastes the resources of all parties involved. PCH claims that the Third Mortgagee's equity cushion was such that there was never an appreciable risk at any time

that the Third Mortgagee would not be paid in full. PCH concludes that the Third Mortgagee's activities pertaining to the stay litigation, relating to venue, analysis of the Pennsylvania statute and fraudulent conveyance actions, attempts to block exclusivity, attendance at depositions unrelated to any litigation directly involving the Third Mortgagee and participation in the Liona bankruptcy were not cost-justified and not truly necessary to protect its client's interest.

■ Although the Third Mortgagee had an equity cushion, the size of this cushion has not been constant and definite throughout the course of the proceedings. The Third Mortgagee claims to have feared that a delay of the sale of the property would only work to diminish the size of its equity cushion. Accordingly, it undertook different courses of action in order to protect its interest. This included filing a motion to lift the automatic stay and participating in the Liona bankruptcy seeking to lift the automatic stay in those proceedings so as to allow the sale of the Hotel to proceed.[24] The Third Mortgagee estimates that charges totaling $29,283 pertain directly to the Liona proceeding. Therefore, $29,283 of the $34,450 [25] charges relating to the Liona bankruptcy shall be allowed. The $4,000 incurred in attending depositions in the Liona/PCH dispute, since it does not relate to the Third Mortgagee's claim, shall be disallowed.

■ The charges relating to the Confession of Judgment will be allowed since this Court has found that the automatic stay was lifted and the Third Mortgagee properly took that course of action. (*See supra*, Discussion at 195). As to the charges relating to the June 18, 1986 letter, PCH claims that they should be disallowed because the Third Mortgagee was seeking

---

**23.** The charges attributed to the services are only an estimate by PCH since the time sheets do not provide sufficiently detailed descriptions for some of the entries.

**24.** Most of the time charges relating to work done in the Liona bankruptcy from December 1, 1986 through January 2, 1987 relate to the automatic stay issue.

**25.** The Third Mortgagee estimates that charges totaling $34,450 relate to the Liona bankruptcy, while PCH claims that the charges add up to $30,000. This Court accepts he Third Mortgagee's calculations.

to pursue acts in violation of the automatic stay. The issue as to whether the Third Mortgagee's threats in the June 18, 1986 letter were violative of the § 362 stay was brought to Judge Lifland's attention at a hearing on July 8, 1986. That issue was never resolved at that hearing since ultimately the Third Mortgagee, after a chambers conference with all of the parties present at which time the Third Mortgagee was fully informed by PCH as to the status of sales negotiations of the property, withdrew its intentions stated in the June 18, 1986 letter. This entire confusion ensued from two sources: (1) a disagreement as to the interpretation of the Drop Dead Stipulation; and (2) the lack of communication between PCH and the Third Mortgagee. While not ruling herein whether the Third Mortgagee sought to violate the automatic stay, it is this Court's belief that the debtor, PCH, should not be required to compensate for the Third Mortgagee's threatened acts which acts were premised on its confusion and lack of information. Accordingly, the charges totaling $3,500, relating to the June 18, 1986 letter, are disallowed.

PCH calls this Court's attention to charges totalling $30,000 for unspecified research and unnecessary research and other activities set forth above. The entries that PCH brings to this Court's attention, indeed, fall short of providing a proper detailed explanation of the services for which the charges are made. Fee applications must, and especially the time sheets supplementing them, must be so complete so as to be self-contained and self-sufficient documents from which all, or at least most, ambiguities can be resolved. *See, In re S.T.N. Enterprises, Inc.*, 70 B.R. 823 (Bankr.D.Vt.1987). Some entries found in Saul, Ewing's computer printed time sheets are so general that they only indicate that either legal research was performed, without a description of the particular issue or project; or they simply state that a conference call took place without indicating with whom and regarding what issue. Such entries cannot be allowed to stand "as is," for this Court cannot assess the reasonableness and relevancy of such charges. Ac-

cordingly, the entire $30,000, is deemed to relate to disallowable charges for research relating to matters which this Court deems not compensable. PCH further claims that the Saul firm utilized an excessive and unreasonably large number of persons. PCH makes this blanket statement without going into any detail as to why such employment of persons was excessive. This Court has looked at the services for which compensation of fees is requested. This Court will disallow fees to the extent that the services are deemed duplicative, unnecessary or inappropriate. But absent such specific showing that the number of persons employed by the law firm were excessive and unreasonable, PCH's claim is baseless.

Naturally, a bankruptcy court may, and very well should, disallow fees under § 506(b) where the creditors' actions have, in fact, unreasonably hindered the entire reorganization process. *See In re Nicfur, supra.* In the instant case, the Third Mortgagee has, for the most part, properly acted to protect its claim. The Third Mortgagee's fee request shall be reduced a total of $42,667 ($5,167, representing the difference between the $34,450 time charges relating to the Liona bankruptcy and the $29,283 portion which is deemed allowable, plus $4,000 for charges relating to attendance to depositions in the Liona/PCH dispute, plus $3,500 for charges relating to the June 18, 1986 letter and $30,000 which relates to unspecified research charges.) Additionally, a reduction to the disbursements claimed ($17,000) should be made by an amount equal to the proportion of disallowed fees to the total request for fees. Such disallowed disbursements total approximately $3,910 (*i.e.*, $42,667, divided by $186,661.90, times $17,000).

## V.  PCH'S REQUEST FOR SANCTION UNDER BANKRUPTCY RULE 9011

PCH seeks sanctions against the Third Mortgagee under Bankruptcy Rule 9011, which incorporates Rule 11 of the Federal Rules of Civil Procedure. The Supreme Court, in a recent decision, recognized that the "central purpose of Rule 11 is to deter

baseless filings...." *Cooter & Gell v. Hartmarx Corp.*, ── U.S. ──, ──, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359, 374 (1990). The Second Circuit in *Eastway Const. Corp. v. City of New York*, 762 F.2d 243 (2d Cir.1985), pronounced the test to be used in determining whether Rule 11 violations have occurred:

> sanctions shall be imposed against an attorney and/or his client when it appears that a pleading has been interposed for any improper purpose, *or where,* after *reasonable inquiry,* a competent attorney could not form a reasonable belief that the pleading is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law.

*Id.* at 254 (emphasis added); *see also Cooter & Gell v. Hartmarx Corp., supra,* ── U.S. at ──, 110 S.Ct. at 2454, 110 L.Ed.2d at 374.

Once a violation of Rule 11 is found to exist, the courts must impose sanctions. *Id.* at 254 n. 7.

PCH seeks sanctions for the following actions by the Third Mortgagee:

1. The Third Mortgagee filed its original Motion and Answer to counterclaims on the theory that a post-bankruptcy acceleration triggered default interest;

2. The denial at ¶ 27 of the Third Mortgagee's Answer to PCH's counterclaim of the causal relationship between the increased interest on the First and Second Mortgages, the decreased interest in the Third Mortgage and the added principal called the Second Part;

3. The Third Mortgagee's letter, dated June 18, 1986, in which it threatened certain actions.

While the Third Mortgagee's actions may have caused PCH to expend more time and money in defending itself, they did not rise to the level of sanctionable actions pursuant to Rule 11.

Settle Order on five (5) days' notice.