The FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for First Federal Savings and Loan Association of Colorado Springs, Plaintiff,

v.

WIDEFIELD HOMES, INC., a Colorado corporation, Defendant.

Civil Action No. 94–B–2299.

United States District Court, D. Colorado.

Feb. 28, 1996.

Richard W. Daily, Tamara K. Vincellette, Powers, Phillips, P.C., Denver, CO, for Plaintiff.

Richard I. Brown, Terri B. Cohen, Haligman and Lottner, P.C., Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

In this action involving the Financial Institution Reform, Recovery and Enforcement Act of 1989 (FIRREA), 12 U.S.C. § 1821 *et seq.*, plaintiff, Federal Deposit Insurance Corporation (FDIC) successor to the Resolution Trust Corporation (RTC) (jointly, receiver), and defendant Widefield Homes, Inc. (Widefield Homes) have filed cross-motions for summary judgment. I will grant FDIC's motion and deny Widefield Home's motion.

## I.

The following facts are stipulated. In 1983, Widefield Homes signed a promissory note for $170,000 with interest at 9% per annum (Widefield Note), payable to First Federal Savings and Loan Association of Colorado Springs (First Federal). The Widefield Note was consideration for Widefield Homes's participation in a bond transaction in which El Paso County issued and sold $3,170,000 in tax-exempt bonds (bonds) which earned 9% annual interest. El Paso County delivered the bond proceeds to Central Bank of Denver (Central Bank), as trustee for the bondholders. Central Bank deposited the proceeds with First Federal which issued a $3,170,000 certificate of deposit, (Central Bank CD). Under the Central Bank CD terms, First Federal agreed to pay interest at the rate of 9% per annum, which was intended to be sufficient to pay interest and principal on the bonds. First Federal then loaned $3,000,000 of the bond proceeds to Widefield Homes to finance construction of a low and moderate income apartment complex. As part of the transaction, Widefield Homes delivered the $170,000 it had borrowed from First Federal (evidenced by the Widefield Note) to Central Bank as trustee for the bondholders to fund a reserve fund (Reserve Fund). By the terms of the trust, the $170,000 Reserve Fund was to be used to pay fees and expenses of the trustee in the event of a default under the trust indenture and for the payment of interest on the bonds, "but only when and to the extent that other moneys are not available." (Trust Indenture Exh.B p. 31)

The Widefield Homes promissory note provides, *inter alia,* that:

[t]his note is secured, to the extent permitted by law, by a reserve account in the Borrower's name, with Central Bank of Denver, a Banking Corporation, Denver, Colorado in the amount of $170,000. Said Borrower assigns all it's (sic) rights, title

and interest in said reserve account to Lender as security for this Note.

The 9% interest earned on the Central Bank CD was used by Central Bank to pay the required 9% interest to the bondholders for approximately 7 years.

On June 26, 1990, First Federal was closed and RTC was appointed as its receiver. Pursuant to § 11(d)(2)(g) of the Federal Deposit Insurance Act and 12 U.S.C. § 1821(f) (FIRREA), on June 29, 1990, RTC entered into a purchase and assumption agreement (P & A) with Western National Bank of Colorado Springs (Western National) under which Western National (a) assumed the liability of the Central Bank CD and (b) purchased the Widefield Note.

Pursuant to the P & A, on July 14, 1990, Western National selected its then current passbook rate of 5.5% as the interest rate it would pay on the Central Bank CD rather than the 9% paid by First Federal. As a result of the interest rate reduction on the Central Bank CD, the revenue stream paid to Central Bank was insufficient to pay the interest on the outstanding bonds. Consequently, Central Bank drew on the Reserve Fund to make interest payments to the bondholders. Central Bank also demanded that the RTC pay the amount by which the Reserve Fund had been depleted. The RTC did not respond to the demand.

In June, 1991, Central Bank determined that the passbook rate combined with the monies from the Reserve Fund would not be sufficient to pay the bondholders through the maturity date of the bonds. Consequently, Central Bank petitioned the Denver Probate Court for instructions on the administration of the trust indenture. On August 21, 1991, the Probate Court held a hearing on Central Bank's petition and on August 26, 1991 ordered Central Bank to accelerate the bonds.

Over the years, the Widefield Note, signed on February 4, 1983 with an original maturity date of September 28, 1983 was extended several times. Ultimately, it came due on February 1, 1992. (Exh.5). The Widefield Note was never paid and was endorsed back to the receiver by Western National on March 23, 1992. The receiver demanded payment which was refused, and this suit was filed. Central Bank and Western National are not parties to this action.

## II.

FDIC moves for summary judgment against Widefield Homes for the full amount of the note, together with 9% interest through maturity and at the default rate of 14% thereafter, attorneys' fees and costs. Widefield Homes' cross-motion, in essence, seeks a declaration that it is not liable to the FDIC on the Widefield Note.

*Widefield Homes Motion for Summary Judgment*

 Widefield Homes states it is not liable on the Widefield Note because the receiver wrongfully transferred to Western National its power under the FIRREA to repudiate contracts of a failed institution. 12 U.S.C. § 1821(e)(1). Widefield Homes argues that Western National repudiated the Central Bank CD contract on July 14, 1990 when it reduced the interest rate from 9% to 5.5%. I do not agree.

In 1989, Congress enacted the FIRREA in response to the "precarious financial condition of the nation's banks and savings and loan institutions." *Resolution Trust Corp. v. Love*, 36 F.3d 972, 975 (10th Cir.1994) quoting *Henderson v. Bank of New England*, 986 F.2d 319, 320 (9th Cir.1993). FIRREA gives broad powers to the RTC "to deal expeditiously with failed financial institutions." *Id.; In re Scott*, 157 B.R. 297 (W.D.Tx.1993).

The FIRREA grants a receiver the right to disaffirm or repudiate contracts the bank entered into prior to receivership if the receiver decides "in its discretion" that performance will be burdensome and that disavowal will promote the orderly administration of the failed bank's affairs. 12 U.S.C. § 1821(e)(1).

Here, the P & A provides, in relevant part:

the Assuming Institution hereby agrees to pay interest on all Deposits assumed by it ... in accordance with the terms of each written agreement between the Failed Association and the depositors of the Failed Association relating to each such Deposit and honor all the terms and conditions of

such agreements, for a period not less than fourteen (14) days commencing the day after Association Closing.... Subject to Section 5.3 herein, *after the expiration of the fourteenth (14th) day, the Assuming Institution shall pay interest on all time saving deposits of the Failed Association at a rate no less than the then current passbook savings deposit rate of interest paid by the Assuming Institution.*

(Exh.19 p. 31) (emphasis supplied).

The P & A did not transfer the Central Bank CD contract intact to Western National. Rather, the P & A modified the interest rate payable on the CD from 9% to a range, the lower end of which was defined as "no less than the then current passbook savings deposit rate of interest paid by the Assuming Institution." *Id.* Thus, the RTC as receiver effectively repudiated the contract when it declined to oblige Western National to pay the previously promised interest rate. Consequently, I need not decide whether the RTC had the power to delegate its repudiation authority because, as a matter of law, Western National did not repudiate the CD contract. When Western National chose to pay its current passbook savings deposit rate of 5.5%, it was merely selecting a particular interest rate consonant with its obligations under the P & A. *See Lawson v. FDIC,* 3 F.3d 11, 14 (1st Cir.1993).

■ Next, Widefield Homes claims it is not liable on the note because Western National did not comply with the P & A notice requirements. Again, I disagree.

Section 5.3 of the P & A requires that the assuming institution give notice to depositors of any changes in the terms of any deposit contract and of the depositors' right to withdraw their deposit without penalty. (Exh.19 p. 32). If no notice is given, the P & A requires the assuming institution "to continue honoring the interest rate on any account ... until the seventh (7th) day after the mailing of the notice." *Id.*

Western National advised Central Bank of the interest rate reduction in a letter dated July 16, 1990 which stated in its entirety:

Enclosed please find a copy of the letter that was mailed to you last week regarding the above mentioned account. On July 14, 1990 the interest rate on the certificate of deposit was lowered to 5.5%. Please feel free to contact me if you have any questions.

(Exh.J)

Widefield Homes argues that the notice was not complete because the letter did not advise Central Bank of its right to withdraw its deposit with no penalty. According to Widefield Homes, Central Bank was therefore precluded from withdrawing its CD and protecting the return on the Reserve Fund. Widefield Homes further reasons that if Central Bank had withdrawn its CD, it could have prevented the depletion of the Reserve Fund which served as security for Widefield Homes's note and prevented the acceleration of the bonds. Further, if the Reserve Fund had not been depleted, the reserve funds would have been available to pay off the Widefield Note and the FDIC would not have a claim against Widefield Homes. Widefield Homes concludes that Western National's failure to comply with the notification requirement to Central Bank renders Western National "liable for any damages resulting from their inaction." However, Western National is not a party to this action and, thus, this argument must fail.

■ Widefield Homes also maintains that Western National defaulted under the terms of the Central Bank CD which, in turn, constitutes a default under the trust indenture. I disagree.

Under the Central Bank CD, the definition of "default" includes:

[if] Lender [fails] to pay the amounts *required to be paid* with respect to ... interest on the Certificate when the same shall become due and payable in accordance with the terms of the Certificate.

(Exh.C p. 22) (emphasis supplied).

I have determined as a matter of law that the amount of interest Western National was required to pay on the Central Bank CD was no less than the current passbook savings deposit rate of 5.5%. It is undisputed that Western National paid the 5.5% rate. Thus, there was no default under the terms of the Central Bank CD or the trust indenture.

FDIC contends Widefield Homes is asserting an affirmative defense pursuant to U.C.C. section 4–3–606, C.R.S. that the receiver and Western National impaired Widefield Homes's collateral, thereby discharging the Widefield Note. (Pltf.S.J.Br. p. 4). Widefield Homes states in its response, however, that it "has not raised C.R.S. § 4–3–3–606 (sic) as a defense in this action." (Def.Resp.Br. pp. 4–5). Also, Widefield Homes executed three successive "Change in Terms Agreements," each containing the following provision:

> All ... parties agree that Lender may renew, extend ... or modify this loan, from time to time, or release any party or guarantor; *impair, fail to realize upon or perfect Lender's security interest in the collateral;* and take any other action deemed necessary by Lender without the consent of or notice to anyone.

(Exh.3) (emphasis supplied).

If Widefield Homes is arguing the defense of impairment of collateral, it is without merit.

*FDIC Motion for Summary Judgment*

■ In the parties' pretrial order, Widefield Homes contends that the lender is required to pay to the trustee a sum equal to the amount necessary to restore the balance in the Reserve Fund, all costs incurred by the issuer as a result of depleting the Reserve Fund, and the amount of any losses incurred by the trustee or the developers as a result of such depletion. (PTO at 5–6).

Article V, section 5.1(c) of the deposit agreement between First Federal and Central Bank provides:

> [i]n the event that the failure of Lender to pay any amount required by the Certificate causes Trustee to dispose of or deplete the Reserve Funds, the Lender shall pay to Trustee within 10 days after receipt of a equal to (i) the amount necessary to restore the balance in the Reserve Funds, (ii) all costs incurred by Trustee as a result of depleting the Reserve Fund, and (iii) the amount of any losses incurred by Trustee or the Developers as a result of such depletion, including the loss of past, present or future interest income which the Trustee would have otherwise received to the

original date of maturity of such investments.

(Exh.C p. 12) (emphasis supplied).

Because, as a matter of law, the lender has not failed to pay any required amount, lender did not cause the trustee to dispose of or deplete the Reserve Fund.

■ The plain language of the "Change in Terms Agreement" (Exh.5) provides, *inter alia:*

> DEFAULT: Borrower will be in default if any of the following happens:
>
> > (a) Borrower fails to make any payment when due....

There is no dispute that Widefield Homes voluntarily participated in the financing program. Thus, it is reasonable to infer that Widefield Homes knew and understood the terms of the Widefield Note, the risks it faced when it signed the note and that it might be liable on the note if First Federal failed and the Reserve Fund was depleted. Indeed, the Widefield Note itself provides:

> This note is secured, to the extent permitted by law, by a reserve account in [Widefield Homes's] name, with Central Bank of Denver ... in the amount of $170,000.00. [Widefield Homes] assigns all it's right, title, and interest in said reserve account to Lender as security for this Note.

(Exh.1)

Moreover, on its face, the deposit agreement contains handwritten provisions favorable to the developers which were inserted before it was signed. Thus, it can be inferred that Widefield Homes knew how to negotiate for contract terms which could have better protected its position on the promissory note.

There is also no dispute that the Widefield Note is in default, demand was made, and no payment was made. As a matter of law, therefore, Widefield Homes is liable on the Widefield Note. Accordingly, the FDIC is entitled to summary judgment against Widefield Homes. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Mares v. ConAgra Poul-*

*try Co., Inc.,* 971 F.2d 492, 494 (10th Cir. 1992); Fed.R.Civ.P. 56(c).

■ The Widefield Note provides for payment of 9% interest on the note through the maturity date. It provides also that:

[u]pon default, including failure to pay upon final maturity, Lender, at its option, may also, if permitted under applicable law, increase the interest rate on this Agreement 5.000 percentage points.

MISCELLANEOUS PROVISIONS: All such parties agree that Lender may ... take any ... action deemed necessary by Lender without the consent of or notice to anyone.

(Exh.1) (emphasis in original).

Hence, FDIC's prayer for post-default interest at the rate of 14% per annum is proper.

Accordingly, it is ORDERED that:

1. Plaintiff's motion for summary judgment against Defendant Widefield Homes, Inc. is GRANTED;

2. Defendant's motion for summary judgment is DENIED;

3. Judgment shall enter in favor of plaintiff against defendant in the principal amount of $170,000.00, together with interest before default, at 9% per annum in the amount of $9,012.33 for a total amount of $179,012.33. Default interest is also due at the rate of 14% per annum from February 2, 1992 through the date of entry of this judgment. Post judgment interest shall accrue at a rate of 4.89% per annum from entry of judgment until judgment is satisfied.

4. Plaintiff is awarded attorneys' fees and shall submit a detailed billing of same within 10 days from the date of this order. Defendant shall submit any response within 10 days thereafter. Plaintiff is also awarded costs.