WARDLAW, Circuit Judge:
Beal Bank (“Beal”) appeals the district court’s order affirming the bankruptcy court’s grant of summary judgment in favor of the debtor, Crystal Properties (“Crystal”). Beal asserts that the bankruptcy and district courts incorrectly concluded that Crystal was not required to pay interest at the default rate on seven defaulted loans Beal acquired from the Federal Deposit Insurance Corporation (“FDIC”). The central issue is whether, and, if so, when, the default interest rate, as provided in the original loan agreement between Beal’s predecessors and the Ngs (later Crystal) is triggered. Beal argues that the default interest rate was triggered the moment the Ngs failed to make interest payments to its predecessors (early 1995). Crystal contends that the default rate became applicable after the first quarter of 1997, when Beal recorded the notices of default. We agree with the bankruptcy and district courts, concluding under well-established authority, that the default interest rate did not apply to Crystal’s loans until the first quarter of 1997, when the holder first took affirmative action to put the debtor on notice that it intended to exercise its option to accelerate, and thus invoked the default rate under the contract at issue. We have jurisdiction pursuant to 28 U.S.C. § 158(d), and we affirm.
I. BACKGROUND
This case arises out of nine loans issued by Guardian Bank (“Guardian”) to Thien Koan Ng and Carol Ng, either directly or indirectly through one of the entities they controlled. Each of the loans was executed in California. The collateral for the loans consisted of real property and/or pledged promissory notes secured by real property in California. The contract rate set forth in each loan document was Bank of America’s prime interest rate, plus one percent. Each loan also included a Premium Interest Rate Clause providing that the unpaid balance would accelerate on default and bear interest at a rate 5% higher than the contract rate. The premium interest rate clause or “default interest clause” in each note states:
Should default be made in any payment provided for in this note, ... at the option of the holder hereof and without notice or demand, the entire balance of principal and accrued interest then remaining unpaid shall become immediately due and payable, and thereafter bear interest, until paid in full, at the increased rate of five percent (5%) per annum over and above the rate contracted for herein. No delay or omission on the part of the holder hereof in exercising any right hereunder, ... shall operate as a waiver of such right or any other right under this note....
Although the Ngs originally acquired at least nine loans from Guardian, only the seven loans set forth below are at issue in this appeal:
*746 Loans Maturity Date Date Default Notice was Recorded
Loan A: Walnut Property March 15,1999 April 3, 1997 (Article 9 foreclosure notice)
Loan B: Mountain View/San Bernardino May 5,1998 February 14,1997 (Notice of Default)
Loan C: Coldwater Canyon November 15, 1997 April 3, 1997 (Article 9 foreclosure notice)
Loan D: Arcadia Property May 10,1997 February 27,1997 (Notice of Default)
Loan E: Palmdale Property December 5,1994 January 10,1997 (Notice of Default)
Loan F: Grand Terrace Property December 5,1994 January 10, 1997 (Notice of Default)
Loan G: Montclair Property September 5,1995 April 3,1997 (Notice of Default)
Of these seven notes, three (Loans E, F, and G) matured prior to the first quarter of 1997-the date upon which the parties agreed the default interest rate became applicable.
By early 1995, the Ngs had missed payments on their loans. Thien Ng entered into negotiations with Guardian to induce the Bank to accept a fifteen percent (15%) discount on the loan balances. On January 20, 1995, the FDIC placed Guardian into conservatorship. After the FDIC assumed control of Guardian’s affairs, Thien Ng continued to attempt to negotiate a pay out.
On February 23, 1995, the FDIC secured a written demand that the Ngs bring their loans current and informed them that failure to do so would result in the FDIC imposing the default rate. The letter notified the Ngs that the FDIC had frozen three of their accounts at Guardian, but had not set off any outstanding loan balances against the funds held in the frozen accounts. Although the letter concluded that the loans “are in default, which involks (sic) the default interest clause,” it contained no statement regarding the amount of the default interest rate or whether the FDIC wished to accelerate the loans.
On March 6, 1995, the FDIC again demanded that the Ngs bring their loans current. This letter specifically stated that because the Ngs had transferred the real property security for three loans identified in the letter (only one of which is among the seven loans in this appeal) to a third party, the FDIC “had triggered the default interest provision of [the] Deeds of Trust.” Notwithstanding that statement, the calculations of the principal and accrued interest owed to the FDIC set forth in the letter were based on the contract rate — and not the default rate.
On May 9, 1995, the FDIC communicated with the Ngs again (in a letter erroneously dated March 9, 1995). The correspondence included a list of the outstanding balances of remaining principal and unpaid interest calculated at the contract rate. This letter made no reference to the default interest clause.
Ten days later, on May 19th, the FDIC wrote to the Ngs outlining their negotiations about a possible 15% discount on the outstanding loans. The FDIC indicated that because Guardian had negotiated a 15% discount on the loans, it might be willing to consider a discount if the Ngs provided financial statements and agreed *747 to keep interest payments current during the negotiations. The letter also represented that the FDIC would withhold taking action on the three loans discussed in the March 6th letter during discount negotiations. ,
The FDIC and the Ngs subsequently reached an agreement to allow the Ngs to pay off all outstanding loans at a 12.5% discount. On August 15, 1996, the FDIC sent the Ngs an accounting statement calculating the principal and accrued interest due on each loan at the contract rate. The letter also noted that the “agreement that we had entered into with you to allow a discounted payoff will expire on September 17, 1996.” Despite reaching this agreement, the Ngs failed to make the negotiated payments to the FDIC and never tendered the loan balances.
Around December 1996, Guardian, through the FDIC, assigned its beneficial rights in the Ngs’s loans to Beal. Because Beal could not reach any settlement agreement with the Ngs as to the overall payoff amount, Beal sent notices of acceleration and default to the Ngs. By the first quarter of 1997, Beal recorded notices of default for all seven loans, an act that the parties agree was legally sufficient to trigger the default interest provision in the notes.
On June 25, 1997, Crystal, a real estate venture corporation owned and controlled by the Ngs, commenced a bankruptcy proceeding by filing a Chapter 11 petition in the Central District of California. One day before Crystal filed its Chapter 11 petition, the Ngs transferred the real property collateral for the seven loans to Crystal. To determine the maximum amount of Beal’s claims, Crystal filed a motion for estimation on August 19, 1997, which was granted. Beal filed proofs of claims for the seven loans on September 12,1997.
In April 1998, the parties cross-moved for summary judgment to determine, inter alia, whether Beal was entitled to apply the default interest rate before the date it filed the notices of default. The bankruptcy court held that it was not:
The real question is, as has always been, can Beal Bank come in as a successor in interest and go back and retroactively apply default interest from a period long before it had any connection with this loan, notwithstanding anything else that went on, and the answer, I think, can’t be yes.
The bankruptcy court further reasoned that it would be inequitable to allow Beal to recover the default interest rate in a period during which it was not actively enforced by Beal’s predecessors in interest. It concluded that the FDIC and Guardian had waived their right to default interest for the periods in which they were holders of the notes.
The bankruptcy court ruled on the remaining issues presented in the cross-motions for summary judgment and entered final orders on May 28,1998.
Beal timely appealed the single issue of applicability of the default interest rate to the district court, which heard argument on April 19, 1999. Affirming the bankruptcy court, the district court held that because Guardian and the FDIC did not take any affirmative action to exercise the option to accelerate, neither entity had triggered the default interest rate. The district court also concluded that the plain language of the notes precluded Beal from collecting default interest on the matured loans because the default interest clause was tied to the option to accelerate. Again, Beal timely appealed.
II. Right to Default Interest
A. Construction of the Contract
Beal argues that because the notes expressly state that default interest is due and payable upon default “without notice or demand,” the default interest rate *748 should begin to accrue the moment Crystal defaulted on the notes. Based on our reading of the notes at issue, we disagree.
“[A] written contract must be read as a whole and every part interpreted with reference to the whole.” Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1032 (9th Cir.1989) (quoting Shakey’s, Inc. v. Covalt, 704 F.2d 426, 434 (9th Cir.1983)). Furthermore, “a court must give effect to every word or term employed by the parties and reject none as meaningless or surplusage.... ” Cree v. Waterbury, 78 F.3d 1400, 1405 (9th Cir.1996) (quoting United States v. Hathaway, 242 F.2d 897, 900 (9th Cir.1957)). Therefore, we must interpret the contract in a manner that gives full meaning and effect to all of the contract’s provisions and avoid a construction of the contract that focuses only on a single provision of the note.
As noted above, all of the notes executed between Crystal and Beal’s predecessors provide:
Should default be made in any payment provided for in this note, ... at the option of the holder hereof and without notice or demand, the entire balance of principal and accrued interest then remaining unpaid shall become immediately due and payable, and thereafter bear interest, until paid in full, at the increased rate of five percent (5%) per annum over and above the rate contracted for herein. No delay or omission on the part of the holder hereof in exercising any right hereunder, ... shall operate as a waiver of such right or any other right under this note....
Thus, “the entire balance of principal and accrued interest then remaining” becomes immediately due and payable “at the option of the holder.” Therefore, the right to accelerate the unpaid debt is at the lender’s option. The notes further provide that if the option is exercised, the notes will “thereafter bear interest ... at the increased rate of five percent (5%) per annum over and above the rate contracted for herein.” The use of the word “thereafter” can only mean that the default interest rate does not become effective unless the holder of the note exercises its option to accelerate. Therefore, we read the contract language, as did the district court, to require the holder to exercise its option to accelerate before the default interest rate is triggered.
Nevertheless, Beal cites to In re PCH Associates, 122 B.R. 181 (Bankr.S.D.N.Y.1990), in support of its contention that the default interest in the notes can be invoked without acceleration. Although PCH Associates holds that the default interest rate in the PCH Associates ’ contract was triggered even though the lender failed to exercise its option to accelerate, the contractual language examined by the court in PCH Associates differs significantly from the contractual language at issue here. The default interest provision in PCH Associates stated: “Following the occurrence of an Event of Default, interest shall accrue on the principal amount hereof at the rate of twelve (12%) percent per annum and shall be payable upon demand.” PCH Assocs., 122 B.R. at 187. The bankruptcy court interpreted this and the other accompanying provisions as providing the lender with two options: “[1] the option to accelerate the entire debt, in which event interest would accrue on both the First and Second Parts, or [2] simply accept the missed payments, albeit late, at a higher [default] interest rate to compensate for the time value of money.” Id. at 197. Here, the provision we are interpreting simply is not analogous to the contract provision at issue in PCH Associates. The notes at issue in this case require that the default interest provision be triggered after acceleration and only provide the lend *749 er with one option. Therefore, PCH Associates is inapposite.
B. Option to Accelerate
1. Affirmative Action Required
Beal argues that even if it was required to exercise its option to accelerate, it was not required to give Crystal notice of its intent to apply the default interest rate. Crystal counters that despite the language in the contract, a creditor must take affirmative action to put the debtor on notice that it intends to exercise its option to accelerate. We believe that Crystal has the better of the argument.
While California law governs the issue,[1] the question is closed to debate. Both state and federal courts have made clear the unquestionable principle that, even when the terms of a note do not require notice or demand as a prerequisite to accelerating a note, the holder must take affirmative action to notify the debtor that it intends to accelerate. See Green v. Carlstrom, 212 Cal.App.2d 240, 243, 27 Cal.Rptr. 850 (1963) (holding that “[t]he option to accelerate a promissory note does not operate automatically but some act is required to effect such acceleration.”) (citation omitted); Trigg v. Arnott, 22 Cal.App.2d 455, 71 P.2d 330, 332 (1937) (holding that the holder of the note must act in a manner that effectively provides notice that the holder has exercised his option); What Is Essential to Exercise of Option to Accelerate Maturity of Bill or Note, 5 A.L.R.2d 968, 971 (1949) (“[A] party having an option to declare a note due and payable cannot simply by his own secret intention, never disclosed by act or word, claim that he declared the note due and payable. The addition of the words ‘without demand or notice’ does not alter the requirement of an affirmative act of the holder of the note for the valid exercise of the option.”); see also United States v. Rollinson, 866 F.2d 1463, 1467 (D.C.Cir.1989) (following precedent holding that, “because acceleration was optional on the part of the holder, affirmative action ... must be taken to make it known to the debtor that he has exercised his option to accelerate”) (internal quotations and citation omitted) (alterations in original); United States v. Feterl, 849 F.2d 354, 357 (8th Cir.1988) (holding that, “[a]s a general rule, ... affirmative action by the creditor must be taken to make it known to the debtor that [the creditor] has exercised his option to accelerate.”) (citation omitted); United States v. Hosko, 1989 WL 265041, *2 (M.D.Pa.1989) (citing Rollinson in holding that “where the acceleration of the installment payments in cases of default is optional, on the part of the holder, then the entire debt does not become due on the mere default of payment but affirmative action by the creditor must be taken to make it known to the debtor that he has exercised his option to accelerate”), aff'd, 884 F.2d 1386 (3d. Cir.1989) (unpublished disposition); Curry v. United States, 679 F.Supp. 966, 969-70 (N.D.Cal.1987) (concluding that “[t]he general rule is that where the acceleration of the installment payments in cases of default is optional ..., then the entire debt does not become due on the mere default of payment but affirmative action by the creditor must be taken to make it known to the debtor that he has exercised his option to accelerate.”) (citation and internal quotations omitted) (alterations in original) (emphasis omitted); United States v. Cardinal, 452 F.Supp. 542, 547 (D.Vt.1978) (“The law is well set- *750 tied that where the acceleration of the installment payments in cases of default is optional on the part of the holder, then the entire debt does not become due on the mere default of payment but affirmative action by the creditor must be taken to make it known to the debtor that he has exercised his option to accelerate, even though the note itself, as is the case here, waives notice of demand”) (emphasis added); Moresi v. Far W. Servs., Inc., 291 F.Supp. 586, 588 (D.Haw.1968) (same); In re Holiday Mart, Inc., 9 B.R. 99, 105 (Bankr.D.Haw.1981) (“It is well established that to exercise an option to accelerate the maturity of a note the holder must take some affirmative action that evidences its intention to accelerate.... This requirement applies even where the note provides for acceleration ‘without notice.’ ”).
We find the overwhelming weight of authority persuasive and note the lack of any law that would contradict the requirement of affirmative action to accelerate. We therefore conclude that the California Supreme Court would adopt the rule that the addition of the words “without demand or notice” does not alter the requirement that the holder of the note must carry out some affirmative act to exercise its option to accelerate.[2] Even though the note here provides that upon default the note can be accelerated “without notice or demand,” Beal or its predecessors must take some affirmative action before acceleration and, in turn, before the default interest rate becomes effective.
This conclusion is further supported by the language of the deeds of trusts for each loan, which provides that the: “Beneficiary may declare ... all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause said property to be sold, which notice Trustee shall cause to be duly filed for record.” Because “[a] note and a deed of trust ... must be read and construed together,” Kerivan v. Title Insurance, 147 Cal.App.3d 225, 230, 195 Cal.Rptr. 53 (1983), the language in the deed of trust supports the conclusion that Beal was required to take some affirmative action “declaring” that it had exercised its option to accelerate and thus triggered the default interest clause.
Therefore, the district court did not err in holding that Beal and its predecessors were required to give Crystal notice of its intent to exercise its option to accelerate the note.
2. Notice and Demand Not Provided
Beal argues, in the alternative, that the two letters sent by the FDIC, its immediate predecessor in interest, constituted affirmative action and notice sufficient to accelerate notes A, B, C, D, and G. It contends that, because the letters accelerated these notes and notified Crystal that it was invoking the default interest rates, the default interest rate should be applied to the outstanding loan amounts dating from the date of each letter, February 23, 1995, and March 6, 1995, not from the recordation dates in the first quarter of 1997. Because these letters did not accomplish what Beal now urges, however, this argument is unavailing.
“The exercise of the option to accelerate must be in a manner that is clear *751 and unequivocal and effectively informs the maker that the option to accelerate has been exercised.... ” In re Holiday Mart, Inc., 9 B.R. 99, 105 (Bankr.Haw.1981); see also First Bank Investors’ Trust v. Tarkio Coll., 129 F.3d 471, 475 (8th Cir.1997) (“ ‘A right to accelerate ... should be clear and unequivocal, and if there is a reasonable doubt as to the meaning of the terms employed preference should be given to the construction which will ... prevent acceleration of maturity.’ ”) (alterations in original) (citation omitted); 11 Am.Jur.2d Bills and Notes § 196 (1997) (“The creditor must perform some clear, unequivocal affirmative act evidencing an intention to take advantage of the acceleration provision .... ”).
Neither the February 1995 letter, the March 1995 letter, nor any other correspondence from the FDIC “clearly and unequivocally” triggered Beal’s option to accelerate and, concomitantly its right to apply the default interest rate.
a. The February 23, 1995 Letter
On February 23, 1995, the FDIC wrote:
The FDIC has not setoff any account, nor has it taken any action of any kind under either real property secured or personal property secured loans. All the FDIC has done is to freeze accounts for which there are delinquent loans out- ' standing. Your loans hoivever, are in default which invokls (sic) the default interest clause.
(emphasis in original). The letter is silent as to the FDIC’s option to accelerate. If any inference is to be drawn from this letter, it is that the FDIC had not exercised its option to accelerate because it states that the FDIC had not used Crystal’s accounts at Guardian to pay down the loan. Although the FDIC did warn Crystal that its loans were in default, it failed to discuss acceleration, a necessary predicate for invocation of the clause.
The Eighth Circuit has found less ambiguous language in a letter from the lender to be insufficient to trigger an option to accelerate and a default interest clause. See Tarkio Coll., 129 F.3d at 474-76. In Tarkio College, the holder of the note, First Bank, on May 14, 1991, wrote the debtor:
This is to advise you, ... that First Bank deems Tarkio College in default of its promissory note to First Bank with respect to the referenced loan transaction. Accordingly First Bank requests Tarkio College to now come forward within the next ten (10) days with full payment of the unpaid principal, $862,396.39, and unpaid and accrued interest of $38,793.70 as of this day, 05/14/91. Interest is accruing at a rate of $283.528 per day.
Id. at 474. Even though this letter clearly stated that the debtor was required to come forward with the full amount within ten days and that interest was accruing at a higher rate, the Eighth Circuit concluded that it “was ambiguous and, therefore, was not a ‘clear and unequivocal’ statement of the bank’s intent to accelerate the loan.” Id. at 475.
Because acceleration clauses are often considered “a penalty and inserted for the benefit of the creditor,” Stewart v. Claudius, 19 Cal.App.2d 349, 353, 65 P.2d 933 (1937), and because “if there is a reasonable doubt as to the meaning of the terms employed preference should be given to the construction which will ... prevent acceleration of maturity,” Tarkio Coll., 129 F.3d at 475 (citation omitted), the February 23, 1995, letter from the FDIC, like that in Tarkio College, did not trigger the option to accelerate or the default interest clause.
*752 b. The March 6, 1995 Letter
As Judge Morrow’s well-reasoned order concluded, the March 6, 1995, letter from the FDIC to Crystal is even less persuasive evidence of an unambiguous intent to accelerate. The letter contains conflicting statements that also fail to clearly invoke the option to accelerate and the default interest clause. The March letter, which actually pertains to only one loan on appeal (Loan G, the Montclair Property) provides:
Because you have transferred title to the following properties without permission of the FDIC as required by the Deeds of Trust, your actions have triggered the default interest provision of those Deeds of Trust ... In addition to the above, there is a 5% default interest due on all remaining principal and unpaid interest. Unless we receive payment in full of all principal and accrued interest by May 31, 1995, on [3 of the loans] where you have sold the property, we will be filing a Notice of Default.
Although, in this letter, the FDIC states that Crystal’s “actions have triggered the default interest provision” with respect to three identified loans, it calculates the debtors’ outstanding principal and interest balances at the contractual interest rate. And although the FDIC later states that “a 5% default interest rate will apply ... in addition” to the contract rate, the manner in which the letter is phrased merely advises the debtors that the FDIC could invoke the default interest clause in the future. See Tarkio Coll., 129 F.3d at 475 (lender’s letter did not clearly state an intention to accelerate or charge the default interest rate when it “applied the contractual interest rate of twelve percent in computing the amounts [and] ... did not state clearly when, if ever, the [default] interest rate of sixteen percent would apply to the outstanding balance of the loan”). Beal argues that Tarkio College is “clearly distinguishable” on its facts because the promissory notes at issue in Tarkio College were “ambiguous as the letter specifically applied the contractual interest rate in computing the amounts noted in the letter.” This argument fails because the FDIC’s March 6th letter to the debtors, like the letter in Tarkio College, applied the contractual interest rate in computing the amounts calculated in the letter.
Moreover, the last sentence in the March 6, 1995, letter reads: “Unless we receive payment in full of all principal and accrued interest by May 31, 1995 ... we will be filing a Notice of Default.” This statement threatening future action demonstrates that the acceleration option had not been exercised and that the FDIC was not demanding immediate payment. Because the debtors were given almost three months to pay the outstanding balances on their loans, the letter did not “clearly and unequivocally” accelerate the loan or trigger the default interest clause.
Finally, in its papers before the district court, Beal admitted that the March 6th letter did not invoke the default rate. Specifically, Beal noted that: “in [the March 6th] letter, Ng was notified that a Premium Interest Rate would be imposed if the loans were not brought current.” Although Beal did not make this same admission in its appellate briefs, it did not deny having made it before the district court. Because a judicial admission made at the district court is binding on this court, see United States v. Bentson, 947 F.2d 1353, 1356 (9th Cir.1991) (judicial admissions before district court that defendant failed to file tax returns for years at issue are binding on the appellate court), Beal is bound by its admission.
*753 c. Subsequent Correspondence from the FDIC to the Debtors
Correspondence between the debtors and the FDIC following the March 6, 1995, letter also fails to indicate any affirmative action or invocation of the default interest provision. On May 9, 1995, the FDIC wrote to the debtors setting forth its calculations of the remaining balances on the loans at the contract rate, and failed to mention its option to accelerate or the default interest clause.
On May 19, 1995, Ruth Daugherty from the FDIC sent a letter to the debtors stating that the FDIC was still considering a 15% discounted settlement. Specifically, the letter noted that Ms. Daugherty was “willing to forestall the filing of Notices of Default without waiving [her] rights to do so in the future, provided [that the debtors would] work toward a resolution at a reasonable discount.” The letter made no reference to the default interest rate. In fact, the letter noted that if the 15% discount were granted, the FDIC would expect the debtor to pay off the loans “within a shorter period of time than the 90 days to which [the debtor] refer[red].” The letter actually lends support to our interpretation of the March 6, 1995 letter. By referencing the March 6th letter as a previous agreement “to [have debtor] repay all of [its loans] within 90 days for a 15% discount of all outstanding principal and interest,” it reiterates that the FDIC had agreed to allow the debtor to pay the amounts due without exercising the default interest clause.
Finally, in an August 15, 1996 letter, the FDIC sent a letter to the debtors calculating “the principal amount due, [the] accrued interest due, and the daily accrual.” The letter specifically recognized that the interest rate had been calculated at the rate “per the signed note previously held with Guardian Bank” and not at the default interest rate. See Tarkio Coll., 129 F.3d at 475-76 (calculating the interest of a note at the contract rate negates an inference of intent to charge at the default interest rate). The letter also acknowledged that the debtor and the FDIC reached a discount agreement negotiated at the contract rate.
This subsequent correspondence weighs in favor of a finding that Beal’s predecessor, the FDIC, never exercised its option to accelerate or invoked the default interest clause in a clear or unequivocal manner. Beal cannot assert rights that the FDIC declined to exercise. See In re Chappell, 984 F.2d 775, 781-83 (7th Cir.1993) (Because predecessor did not assert its right to interest during the life of the plan despite several opportunities to do so, the successor in interest was barred from obtaining any interest on a second mortgage).
C. Matured Loans
Beal argues that no affirmative act was required to trigger the default interest clause in the three loans (Loans E, F, and G) that matured before the first quarter of 1997. It contends that the default interest rate was automatically due and payable as of the date of maturity because there was no unpaid balance left to accelerate on these loans. This argument ignores the plain language of the contract.
The default provision in all seven loans provides:
Should'default be made in any payment provided for in this note, ... at the option of the holder hereof and without notice or demand, the entire balance of principal and accrued interest then remaining unpaid shall become immediately due and payable, and thereafter bear interest, until paid in full, at the increased rate....
*754 The two critical clauses-“should default be made in any payment ...” and “the entire balance ... shall become immediately due and payable”-cannot be applied to a debt that has matured. Thus, as noted supra, this provision is an acceleration clause in which the lender’s ability to charge default interest is tied to its option to accelerate. Because on maturity there is no debt left to accelerate, .see In re Entz-White Lumber & Supply, Inc., 850 F.2d 1338, 1342 (9th Cir.1988) (noting that on maturity, acceleration is unnecessary), the default interest provision in the debtor’s note only applies to payment defaults that occur during the term of the note where the lender elects to accelerate. By its very terms, the default interest provision cannot be charged post-maturity.
Although Beal asserts that the district court erred in its analysis, it does not refute the district court’s interpretation of the contract. Instead, Beal reiterates that it is “axiomatic” that once a note matures, the total balance is due and payable and therefore the default interest provision should apply. Beal misses the point of the district court’s holding. The district court did not rule contrary to the notion that a “matured note” is “due and payable” on the day of maturity. Rather the district court held that, under the plain language of the contract, the default interest “provision contemplates that default interest will be payable only if the lender elects to accelerate and the full principal balance comes due prior to the ‘maturity date.’ ” Therefore, the district court concluded that because the matured notes are “due and payable” and thus cannot be accelerated, the plain language of the contract precluded Beal from applying the default interest provision after the loans matured.
As Judge Morrow correctly noted in her order, Beal’s predecessors easily could have drafted a provision that triggered the default interest provision either upon maturity or acceleration. See, e.g., Tarkio Coll., 129 F.3d at 474 (“Any unpaid balance remaining under the note after the maturity date of July 1, 1995, or after acceleration of the loan by First Bank would accrue interest at a ‘post-maturity rate’ of sixteen percent per year.”) (emphasis added); In re Pikes Peak Water Co., 779 F.2d 1456, 1457-58 (10th Cir.1985) (“The principal or unpaid balance thereof ... shall draw interest at the rate of thirteen per cent (13%) per annum after the maturity date of any respective payment or upon declaration of default.”) (emphasis added); In re Realty Assocs. Sec. Corp., 163 F.2d 387, 390 (2d Cir.1947) (“[A]fter an ‘event of default’ (nonpayment at maturity being specified as one such event) [an interest rate of five per cent (5%) per annum] ... shall be applied to payment of the principal and interest then owing.”) (emphasis added); RTC Mortg. Trust v. J.I. Sopher & Co., Inc., 1998 WL 132815, *5 (S.D.N.Y.1998) (“In the event of the occurrence of a default beyond the applicable cure period, if any, or the non-payment of this Note on the Maturity Date, then interest shall accrue at the Maximum Rate until this Note is paid in full.”) (emphasis added); FDIC v. Widefield Homes, Inc., 916 F.Supp. 1074, 1079 (D.Colo.1996) (discussing note that provided: “[u]pon default, including failure to pay upon final maturity, Lender, at its option, may also ... increase [the interest to the default interest rate]”) (emphasis added); F.D.I.C. v. Boyarsky, 1995 WL 373483, *1 (S.D.N.Y.1995) (“The Note had a maturity date of July 1, 1992 and provided for a default interest rate at the adjustable rate plus 3%, to apply after the maturity date or upon acceleration after an event of default.”) (emphasis added); In re Route One W. Windsor Ltd. P’ship, 225 B.R. 76, 78 (Bankr.D.N.J.1998) (“The Barclays note provides that upon and following either the (i) maturity date or (ii) *755 default by the debtor, the note shall bear interest at ... the ‘default rate.’ ”) (emphasis added); In re Ace-Texas, Inc., 217 B.R. 719, 721 (Bankr.D.Del.1998) (“Pursuant to the terms of the Notes, ... interest on unpaid principal and interest accrues at a default rate ... [from and after maturity].”); River Bank Am. v. Tally-Ho Assocs., L.P., 1991 WL 35719, * 6 (Del.Super.Ct.1991) (“The Mortgage Note which is involved here provides that the ‘Default Rate’ shall be paid ‘In the event of (a) the maturity of the entire indebtedness evidenced hereby, or (b) any default hereunder.’ ”) (emphasis added).
Beal further argues that the Uniform Commercial Code (“UCC”) supports its claim that the default interest clause should apply on a matured note. The UCC provision, § 3-304, as adopted by the California Commercial Code, provides: “If the principal is payable in installments and a due date has not been accelerated, the instrument becomes overdue upon default under the instrument for nonpayment of an installment, and the instrument remains overdue until the default is cured.” This language, however, does not lend support to Beal’s argument. Although it is true that an instrument becomes overdue upon default, the UCC provision does not state that despite contrary contractual language, a default interest provision automatically applies once a loan matures.
Beal also argues that the district court erred in holding that the default interest clause could not apply to the matured loans, contending that the bankruptcy court found otherwise. It points to isolated language contained in the transcript of the hearing before the bankruptcy court:
Four of the loans were all due and payable, I think it appears to me that notice with regard to the default rate of interest rate is not required because there is nothing to accelerate.
It is not entirely clear whether the bankruptcy court actually made a finding that the default interest rates were triggered on the matured loans (Loans E, F, and G). The bankruptcy court stated in its oral holding: “I think what I said at. the beginning is that on the mature loans, it’s not clear to me that notice is necessary, but it was not an issue that I had to essentially reach on the matured loans.”
However, even if the bankruptcy court did hold that an affirmative action was not necessary for the matured loans, and thus the default interest rate may be applicable, this has no bearing on our de novo review of the district court’s order. We have held that an appellate court may affirm a district court’s order to affirm “on any ground finding support in the record, even if the district court relied on the wrong grounds or wrong reasoning.” Laboa v. Calderon, 224 F.3d 972, 981 n. 7 (9th Cir.2000) (citing Marino v. Vasquez, 812 F.2d 499, 508 (9th Cir.1987)). “Because the district court functions as an appellate court in reviewing’ a bankruptcy decision and applies the same standards of review as a federal court of appeals, the district court may also affirm a bankruptcy’s order ... on any ground supported by the record.” Bogart v. Peter-Douglas, G.R., 2000 WL 1132189, *3 (D.Or.2000). See also In re Daniels-Head & Associates, 819 F.2d 914, 918 (9th Cir.1987) (When reviewing a bankruptcy court’s decision, “[t]he district court acts as an appellate court.”); In re Webb, 954 F.2d 1102, 1103-04 (5th Cir.1992) (“When reviewing a bankruptcy court’s decision ..., a district court functions as [an] appellate court and applies the standard of review generally applied in federal court appeals”) (footnote omitted); In re St. Mary Hospital, 120 B.R. 25, 28 (Bankr.E.D.Pa.1990) (“The district court may affirm the decision of the bankruptcy court on any basis that finds support in the *756 record.”), aff'd, 931 F.2d 51 (3d Cir.1991) (unpublished disposition).
Finally, Beal argues that the bankruptcy court erred in finding that the principles of waiver and estoppel precluded Beal from applying the default interest rate to the matured loans. Because, like the district court, we conclude that the plain language of the contract precluded the default interest rate from applying to the matured loans, we need not reach the issues of waiver and estoppel.
AFFIRMED.

. See, e.g., Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (holding state law governs property interests in bankruptcy proceedings “[u]nless some federal interest requires a different result. ... ”).

. See NLRB v. Calkins, 187 F.3d 1080, 1089 (9th Cir.1999) (where state’s highest court has not addressed an issue, federal court’s task is to "predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance”) (internal citations omitted).