In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-1590

MARIA E. MATOS, on behalf of all wrongful death
beneficiaries of LUIS R. MATOS, JR., Deceased,
and as Special Administrator of the ESTATE OF
LUIS R. MATOS, JR.; CARLITO MAXWELL, a minor,
son of the Decedent; ANASTHASIA SANCHEZ,
daughter of the Decedent; CHRISTINA DIAZ,
daughter of the Decedent; and BENJAMIN DIAZ,
son of the Decedent,

*Plaintiffs-Appellants*,

*v.*

WILLIAM O'SULLIVAN; AMY LIPCAMAN;
ROSE J. COX, M.A.; CHARLES R. BARTELS, M.S.;
and JUDITH A. TERRELL, M.D.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 99-3190—**Jeanne E. Scott**, *Judge.*

ARGUED MAY 16, 2003—DECIDED JULY 2, 2003

Before FLAUM, *Chief Judge*, and EASTERBROOK and
ROVNER, *Circuit Judges*.

FLAUM, *Chief Judge.* In August 1998 Luis Matos com-
mitted suicide by hanging himself in his cell at the West-

ern Illinois Correctional Facility. Maria Matos, the deceased's sister and guardian of his estate, and Luis Matos's children (collectively "the Estate") brought this action under 42 U.S.C. § 1983 and Illinois state law, claiming that prison warden William O'Sullivan, correctional officer and crisis team member Amy Lipcaman, prison intake psychologist Charles Bartels, prison treating psychologist Dr. Rose Cox, and prison treating physician Dr. Judith Terrell, each violated Luis Matos's constitutional rights by acting with deliberate indifference to his risk of suicide. The Estate now appeals from the district court's grant of summary judgment in favor of all defendants on the federal § 1983 claim and the court's decision not to exercise jurisdiction over the Illinois state law claims. We affirm.

## I. BACKGROUND

Luis Matos first entered the Illinois prison system on August 9, 1996, at the Joliet Correctional Center ("Joliet"). At that time he participated in a routine mental health screening interview with Illinois Department of Corrections employee Charles Bartels, who holds a masters degree in clinical psychology and counseling. Bartels's report of his interview with Matos stated:

> This 35 year old was seen on 8/9/96 for screening without benefit of any corroborative data except which he was willing and able to reveal. He was alert. He was oriented in three spheres. Mood was appropriate. Affect was within normal limits. A history of substance abuse was admitted. Current substance abuse was admitted. . . . Present suicidal ideation is denied. Present evidence of major depression was not noted. Hallucinations were denied. A history of psychiatric treatment was denied. Anticipated difficulties of adjustment were denied. Present family contact

was reported. Need for present mental health services was denied.

Also on that day, Matos provided information about his mental health to a different prison employee who recorded it on a "Reception and Periodic Medical History" form. This form stated that Matos had a history of psychological treatment, had suffered from manic depression-schizophrenia, had attempted suicide in 1995 by jumping in front of a train, and was in urgent need of a mental health referral. There is no other evidence in the record indicating that Matos suffered from any psychiatric or psychological problems during his initial 10-month term of imprisonment in Joliet.

Matos was on supervised release from his 1996 sentence when he was arrested for driving under the influence of alcohol and without a license in November 1997. He served his time for these infractions in the custody of DuPage County, Illinois, until June 18, 1998, at which time he returned to the custody of the Illinois Department of Corrections to serve the remainder of his 1996 sentence for violating the terms of his supervised release. At Joliet, Matos again underwent the routine "Reception and Classification" intake process, and again was interviewed by Charles Bartels. Bartels's report on Matos in 1998 was nearly identical to the one from the 1996 interview, except that Matos was asked a few additional questions in 1998 about his history of sexual abuse or assault. Matos apparently did not fill out a new "Reception and Periodic Medical History" form at this time, and there is no evidence that the information from the 1996 form was provided to or known by Bartels or any other Department of Corrections employee when Matos re-entered the Illinois prison system in 1998.

A week later, on June 26, 1998, Matos was transferred from Joliet to the Western Illinois Correctional Facility

("Western") to serve out his sentence. A few days after he arrived at Western, Matos was evaluated by staff psychologist Dr. Rose Cox due to the recent death of his father. Dr. Cox's report of June 30, 1998, stated:

> Inmate denies reports of any suicidal ideations or homicidal ideations at the present time. Inmate states he doesn't want counseling. Inmate states he is feeling depressed however, he is not suicidal. Inmate was crying on during session while processing feeling of frustration dealing with recent death of father. Inmate he wanted to know if he could talk to his mother by phone. . . . I have encouraged this inmate to come for counseling however, he declined. No further follow up at this time. Will refer this inmate to see Dr. Newman for psychotropic consultation. I have requested therapeutic call for 5 minutes only be granted to the inmate to call his family.

A few days later, Matos asked to speak with one of the prison's crisis team members about his feelings of depression, frustration, and confusion related to the death of his father. Correctional officer and crisis team member Amy Lipcaman immediately responded to his request and interviewed Matos within five minutes of receiving his call. Her report of July 4, 1998, stated that Matos was "having troubles coping with two recent deaths in family (mother and father),"[1] was unable to "find comfort from family due to transferring in [to Western from Joliet] and being assigned to locked down wing," and was "very emotional but felt he could resolve the problem. Did not feel he wanted to hurt himself or others at this time." Lipcaman's report also stated that Matos would be referred to a psychologist.

---

[1] In fact, only Matos's father had died. His mother, Aida Velazques, is still alive.

Not long after his conversation with Lipcaman, Matos suffered a seizure and was taken to the prison's health care unit for observation. The following day, on July 13, 1998, Dr. Judith Terrell, Medical Director of the health care unit, treated Matos for his seizure disorder. After examining Matos and reviewing the lab reports from his initial physical, which was conducted on July 2 by another of the prison's doctors, Dr. Terrell increased Matos's prescription for his seizure medication, Phenobarbital. Dr. Terrell also noted that Matos showed no signs of compromised mental ability from his seizure activity, nor of delusions, hallucinations, or psychopathology; nevertheless, Dr. Terrell referred Matos to Dr. Cox for a "follow-up evaluation."

Following Dr. Terrell's referral, Matos met again with Dr. Cox on July 15. Dr. Cox's report of this session states that Matos was alert and lucid, that he denied any suicidal or homicidal ideations, and that he gave no indication of delusions or hallucinations, although he admitted to feeling distressed about his father's death. Dr. Cox noted that no crisis watch was needed and that Matos should enroll in the prison's stress management program. Dr. Cox stated in her affidavit, and it is undisputed by the Estate, that it was her professional opinion following her sessions with Matos that he did not pose a threat to himself or others. Had he posed such a threat, Dr. Cox stated that she would have arranged immediately for precautions to be put into place.

Dr. Terrell saw Matos again on July 20 for follow-up treatment for his seizures. Dr. Terrell's report from her exam stated that Matos was non-compliant with his seizure medication and complained of drowsiness from taking another prescribed medication; as before, Dr. Terrell did not observe any evidence of mental incapacity, delusions, hallucinations, or psychopathology. Matos had blood drawn a few days later and the test again showed

his medication levels to be sub-therapeutic. On August 4, 1998, a nurse met with Matos to discuss with him the importance of taking his seizure medication daily. There is no evidence of further seizure activity before Matos's death on August 8, nor any evidence that the seizures or his preventative medications contributed in any way to Matos's suicide.

As additional evidence of Matos's alleged predisposition to suicide, the Estate submitted the expert report of Dr. Ronald Shlensky, a board-certified psychiatrist specializing in forensic psychiatry, and the affidavit of Maria Matos, the deceased's sister. Dr. Shlensky opined that "it was quite clear that [Matos] was psychotically depressed and suicidal" and that he possessed "almost every single danger sign of a suicide risk." Dr. Shlensky based his opinion on (1) Matos's self-reported history of suffering from manic depression, (2) his attempted suicide in 1995, (3) his history of substance abuse, (4) his frequent complaints of depression, (5) the recent loss of his father, and (6) the higher rate of suicide among inmates in Matos's age group. Maria Matos stated that her brother called her almost daily from Western, was often crying, and at least once told her that he was thinking of committing suicide. Maria does not claim that she informed any of the defendants or other staff at Western of her brother Luis's alleged suicide threat.

On August 8, 1998, Matos was found by a correctional officer hanging by a bed sheet and boot lace in his cell. Attempts to revive him using CPR failed, and Matos was pronounced dead by suicide.

## II. DISCUSSION

We review the district court's grant of summary judgment to the defendants *de novo*, viewing all facts and drawing all reasonable inferences in favor of the Estate.

*See Melton v. Melton*, 324 F.3d 941, 944 (7th Cir. 2003); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The Estate argues that each of the defendants, through his or her deliberate indifference to Matos's risk of suicide, violated Matos's constitutional right to receive adequate medical supervision and care during his confinement. A successful § 1983 claim based on a violation of the Eighth Amendment requires the Estate to prove two things: (1) that the harm to Matos was objectively, sufficiently serious and a substantial risk to his health or safety, and (2) that the individual defendants were deliberately indifferent to Matos's health and safety. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97, 103-06 (1976); *Estate of Novack v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000). The first prong is satisfied here since suicide is an objectively serious harm. *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001). In dispute in this case is the second prong, which requires the Estate to prove that each individual defendant subjectively knew that Matos was at substantial risk of committing suicide *and* that each individual defendant intentionally disregarded that risk. *Novack*, 226 F.3d at 529. We have said that deliberate indifference requires a showing of more than mere or gross negligence, but less than purposeful infliction of harm. *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002); *Proffitt v. Ridgway*, 279 F.3d 503, 506 (7th Cir. 2002) (explaining that deliberate indifference to prisoner's safety implies avoidance of *known* risk, not merely foreseeable risk).

The Estate cannot prevail on its § 1983 claim because it has failed to produce any evidence showing that the defendants had actual knowledge of Matos's risk of suicide. In particular, two undisputed facts defeat appellants' claim. First, Matos never told any of the defendants that he felt suicidal or depressed beyond his control during his incarceration at Western, despite having been asked

the question numerous times during intake interviews, psychological evaluations, crisis counseling, and physical exams. And second, not one of the defendants who interviewed or examined Matos—each of whom was trained in psychology, social work, medicine, or crisis response— ever determined after seeing him that he exhibited suicidal or delusional tendencies or that he needed to be placed on crisis or suicide watch. Beyond their interactions with and observations of Matos, the defendants had only one other piece of information that might have suggested to them that he was at risk of committing suicide, the "Reception and Medical History" form. This form recorded the fact that Matos had once, years earlier, attempted suicide by jumping in front of a train, but all of the defendants insist that they never saw this form and the Estate cannot rebut their assertions.

Even if we assume that this form should have been included in Matos's medical history and reviewed by the defendants, it still does not prove that the defendants intentionally disregarded a known risk to Matos's safety. Considering these facts and being mindful of our duty to draw all inferences in favor of the Estate, we can at most suppose that the defendants should have known not to take "no" for an answer when Matos told them he was not suicidal. But that inference, if it leads anywhere, leads only to negligence, and we have already said that deliberate indifference implies a level of misconduct more severe than negligence. *See Proffitt*, 279 F.3d at 506.

The Estate, recognizing that it lacks direct evidence of the defendants' knowing disregard of Matos's suicidal tendencies, contends that we should nevertheless infer the requisite intent from the very fact that the risk to Matos was so obvious. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Based on the expert opinion of Dr. Shlensky, the Estate argues that several pieces of information about Matos (i.e., his history of suffering from

manic depression, his attempted suicide in 1995, his history of substance abuse, and his frequent complaints of depression related to the recent loss of his father and his transfer to the lock down wing) add up to only one conclusion: that Matos was quite clearly psychotically depressed and suicidal. The Estate insists that the defendants should have ascertained Matos's risk of suicide through these several factors and should not now escape liability for his suicide simply because Matos never actually told them he was suicidal.

The main flaw in the Estate's reasoning is that it ignores the context in which this allegedly obvious diagnosis of suicidal depression should have occurred: a prison. As a population, prison inmates are around nine times more likely to commit suicide than free persons, and yet not every prisoner who shows signs of depression or exhibits strange behavior can or should be put on suicide watch. *See, e.g., Cavalieri v. Shepard*, 321 F.3d 616621 (7th Cir. 2003); *Jutzi-Johnson v. United States*, 263 F.3d 753, 757 (7th Cir. 2001). The fact that Matos felt distress over the death of his father, expressed unhappiness with his transfer to a locked-down wing of the prison, and complained of general malaise related to his incarceration is neither surprising nor remarkable. Against this backdrop, we certainly will not impute actual knowledge of Matos's risk of suicide to the defendants.

### III. CONCLUSION

Were we dealing with a case of simple negligence, the Estate's argument, based largely on what the defendants should have known about the severity of Matos's depression, might be more compelling. But we are instead evaluating a § 1983 claim which requires a showing of deliberate indifference to Matos's safety while he was incarcerated under the defendants' watch. The evidence

shows that Matos received a great deal of medical and psychiatric attention during his brief stay at Western in the summer of 1998; it also reveals that not one of the defendants who came into contact with Matos ever supposed, nor actually knew, that Matos posed a grave risk to his own life. The Estate has not established that any defendant intentionally disregarded a known risk to Matos's health and safety; therefore, the district court's grant of summary judgment to all defendants on the federal § 1983 claim, as well as its decision to dismiss the Illinois state law claims, is AFFIRMED.

A true Copy:

     Teste:

 

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*